**MAPCO ALASKA PETROLEUM, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 550–89C.**

United States Court of Federal Claims.

Dec. 22, 1992.

Allen B. Green, Washington, DC, for plaintiff. J. Keith Burt, Washington, DC, and Lin Patterson, Tulsa, OK, of counsel.

Sheryl L. Floyd, with whom were Asst. Atty. Gen. Stuart M. Gerson, David M. Cohen, and Terrence S. Hartman, Washington, DC, for defendant. Howard M. Kaufer, Defense Fuel Supply Center, Alexandria, VA, of counsel.

## OPINION

BRUGGINK, Judge.

Pending are cross-motions for summary judgment as to Count I of plaintiff's complaint. The primary issue raised is whether two economic price adjustment ("EPA") clauses contained in a fuel supply contract are contrary to the Federal Acquisition Regulations ("FAR"), thus rendering that portion of the contract unenforceable. We find that the EPA clauses employed by the Government were unauthorized, but ruling is deferred as to the ultimate effect of that illegality.

### I. FACTUAL BACKGROUND

On September 24, 1986, the Government, acting through the Defense Fuel Supply Center ("DFSC"), awarded contract No. DLA600–86–D–0852 to plaintiff, MAPCO Alaska Petroleum, Inc. ("MAPCO"). Un-

der the contract, MAPCO agreed to sell three types of fuel to DFSC at various delivery points within the state of Alaska for one year. The three types of fuel to be delivered were DFA, a diesel fuel; MUR, an unleaded regular gasoline; and JP–4, a jet fuel.

The contract contained a base price for each of the fuel types. Periodically during the course of contract performance, these prices were adjusted by means of two EPA clauses, B19.22 and B19.33. The clauses adjusted the price upward or downward depending on fluctuations in price indexes reported in *Petroleum Marketing Monthly* ("PMM"), a publication issued monthly by the Energy Information Agency, a division of the Department of Energy ("DOE"). Every petroleum refiner in the United States is required to report its sales prices and volumes to the DOE, which in turn publishes in PMM the average prices, broken down by state and region, for each of several petroleum products. The average sales price for a product is referred to as its "PMM Index."

The device or reference used in an EPA clause to adjust the prices is called the "escalator." The escalator in clauses B19.22 and B19.33 was the PMM Index. Under the MAPCO contract, the price for each fuel type was increased or decreased depending on changes in the current applicable PMM Index as compared with the level of that index at the time the contract was executed. Clause B19.22 adjusted the prices of DFA fuel based on fluctuations in the PMM Index for Alaska sales of kerosene-type jet fuel. Similarly, clause B19.33 adjusted the price of MUR based on fluctuations in the PMM Index for Alaska sales of unleaded regular gasoline. PMM does not publish an index for JP–4,[1] so the price of JP–4 was adjusted based on the fluctuation of a composite index derived from a weighted average of the other two PMM Indexes used. Because JP–4 is approximately 30% kerosene and 70% naphtha, the composite index for the price of JP–4 was

calculated by adding 30% of the kerosene-type jet fuel index to 70% of the unleaded gasoline index.

Over the course of the contract, the margin between MAPCO's crude oil costs and the price it received from DFSC for refined petroleum products declined sharply. During the first five months of performance, the contract price of JP–4 was decreased by clause B19.33 from $0.3800 per gallon to $0.2469 per gallon. During that same period, MAPCO's crude oil costs, as set by the state of Alaska, rose from approximately $4.61 a barrel to $8.99 a barrel. Thus, while the price MAPCO received under the contract fell approximately 35%, its raw material costs increased nearly 95%.

On November 2, 1988, MAPCO filed a claim with Robert Petrosky, the DFSC's contracting officer, seeking a $10,289,649 adjustment pursuant to the contract's disputes clause. MAPCO stated that it had arrived at this amount by applying an index based on the contractor's costs rather than the PMM Index then in effect. MAPCO argued that the index used in the contract violated applicable provisions of the FAR. DFSC's final decision, dated March 30, 1989, denied that the PMM Index violated procurement regulations and refused to reform the contract. MAPCO initiated the present action on October 10, 1989. In Count I, MAPCO renewed its allegation that the PMM Index was contrary to the regulations. MAPCO now seeks partial summary judgment as to Count I. The Government likewise moves for summary judgment on that count. It continues to argue that the price index to which the parties contracted complies with all relevant regulations.

## II. DISCUSSION

█ In Count I of the complaint, MAPCO alleges that EPA clauses B19.22 and B19.33 violate the FAR.[2] It is well-settled that applicable provisions of the FAR are incorporated into every federal government

---

**1.** The Government is the only consumer of JP–4, so there is no "market" from which the DOE can derive an average sales price.

**2.** The 1986 version of the FAR governs the present case.

procurement contract and have the same effect as if they were set forth in the contract itself. *See Chris Berg, Inc. v. United States,* 192 Ct.Cl. 176, 182, 426 F.2d 314, 317 (1970). As the Court of Appeals for the Federal Circuit has stated in reference to an index used in an EPA clause, "[i]f the ... index violate[s] the [procurement regulations], the government cannot, by law, benefit from it." *Beta Sys. v. United States,* 838 F.2d 1179, 1185 (Fed. Cir.1988); *see also Craft Mach. Works, Inc.,* 90–3 B.C.A. (CCH) ¶ 23,095 at 115,969, 1990 WL 133158 (ASBCA June 29, 1990). Under such circumstances, the contract is rendered illegal. The court treads warily into the territory of contract illegality, however. The Federal Circuit and its predecessor, the Court of Claims, have warned that contracts should not be nullified on the basis of illegality unless the illegality is plain. *United States v. Amdahl Corp.,* 786 F.2d 387, 394 (Fed.Cir.1986); *see also Torncello v. United States,* 231 Ct.Cl. 20, 27, 681 F.2d 756, 761 (1982). After a thorough search of the record and the arguments offered by each party, however, the court is satisfied that the EPA clauses are plainly inconsistent with the FAR.

### A. *FAR § 16.203–1*

 The agreement in question describes itself as a "Fixed Price with Economic Price Adjustment" contract. MAPCO therefore contends that the applicable FAR provision is § 16.203 ("Fixed-price contracts with economic price adjustment"). FAR § 16.203–1, entitled "Description," provides as follows:

> Economic price adjustments are of three general types:

**3.** In support of this claim, defendant cites *Gale Barstow, Inc.,* 86–2 B.C.A. (CCH) ¶ 18,758, 1986 WL 19640 (ASBCA Jan. 24, 1986). In *Gale Barstow,* the Board considered an EPA clause in a DFSC contract for the supply of petroleum products. The escalator was an average of wholesale prices for petroleum products printed in the *Lundberg Letter,* a price summary presumably similar to the PMM. The contractor in that case did not challenge the legality of the EPA clause. It did, however, object to the use of the *Lundberg Letter* as the escalator, claiming that the *Letter* reflected the average of wholesal-

> (a) *Adjustments based on established prices.* These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.
>
> (b) *Adjustments based on actual costs of labor or material.* These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) *Adjustments based on cost indexes of labor or material.* These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

48 C.F.R. § 16.203–1. MAPCO contends that EPA clauses B19.22 and B19.33, which use the PMM Index as an escalator, do not fit within any of these three types.

In response to this argument, defendant first asserts that clauses B19.22 and B19.33 satisfy the description set out in FAR § 16.203–1(a), in other words, that the average price figures taken from the PMM Index constitute agreed-upon, "published or otherwise established prices of specific items or the contract end items." *Id.* This argument turns on the meaning of the phrase "established prices." MAPCO interprets the phrase to mean the contractor's own established prices rather than a price index or the average of other refiners' prices as was the case with clauses B19.22 and B19.33. Defendant, on the other hand, contends that the phrase "established prices," is much more flexible, encompassing almost any agreed-upon price adjustment system, especially those that are published, like the PMM Index.[3]

ers' prices, rather than an "absolute" price. The Board rejected the appeal because the contractor failed to protest the choice of the escalator prior to the award of the contract. *Gale Barstow,* 86–2 B.C.A. at 94,450.

Although the Board in *Gale Barstow* ruled in the Government's favor, *Barstow* cannot be said to uphold the use of a price index for contract end items as an acceptable escalator for EPA clauses. The Board was not called upon to construe FAR § 16.203 as we are today, and the legality of the EPA clause was not questioned.

However, as MAPCO points out, the meaning of "established prices" in FAR § 16.203–1(a) is clarified by the "Limitations" provision, § 16.203–3, which specifically refers to "contractor's established prices." [4] Because it is located in the same section, the language of § 16.203–3 plainly gives meaning to the phrase "established prices" used in § 16.203–1(a). This is made clearer by an examination of the history of § 16.203.

The FAR were the result of a project begun in 1978 to unify and simplify the federal procurement system. At that time, federal procurement was generally governed by two systems of regulations, the Defense Acquisition Regulations ("DAR") and the Armed Services Procurement Regulations ("ASPR"). Periodically between 1978 and September 19, 1983, when the Department of Defense ("DOD"), General Services Administration ("GSA") and NASA published a final draft of the FAR, *see* "Establishing the Federal Acquisition Regulation," 48 Fed.Reg. 42,102 (1983) (as codified at 48 C.F.R. §§ 1–99), the Office of Federal Procurement Policy ran a statement as to the purposes underlying the FAR:

> The fundamental purposes of the FAR are to reduce proliferation of regulations; to eliminate conflicts and redundancies; and to provide an acquisition regulation that is simple, clear and understandable. *The intent is not to create new policy.* However, because new policies may arise

concurrently with the FAR project, the notice of availability of draft regulations will summarize the section or part available for review and describe any new policies therein.

*See, e.g.,* "Types of Contracts," 46 Fed. Reg. 42,303 (1981) (emphasis added). No new policies were described in the portion of the draft summarizing FAR Part 16, which governs the present dispute. *See id.* at 42,304.

■ As MAPCO notes, FAR Subpart 16.2 and its forerunners in the DAR and ASPR reveal that Subpart 16.2 is largely a reproduction of DAR § 3.404, except that the original order of the DAR sections that now comprise § 16.203 were altered in promulgating the FAR. The provision that became FAR § 16.203–1, listing the three general types of EPA clauses, was derived from DAR § 3–404.3(b). The "Limitations" provision, FAR § 16.203–3, was derived from DAR § 3–404.3(a).[5] Thus, while no substantive effect was intended, the order of those two provisions was reversed in the transition from the DAR to the FAR. In the DAR, the provision that came first expressly referred to the need to make any adjustments because of fluctuations in the *contractor's* established prices. Next, the DAR listed the three allowable types of EPA clauses. The word "contractor's" could then be omitted from the subsequent term "Adjustments based on established prices," and the term would still convey same meaning.[6] For defendant's argument

---

4. FAR § 16.203–3 provides:

 A fixed-price contract with economic price adjustment shall not be used unless the contracting officer determines that it is necessary either to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices.

5. DAR § 3–404.3 was essentially equivalent to the "Limitations" provision in the FAR. DAR § 3–404.3 provided:

 (a) *General.* The fixed price contract with economic price adjustment may be used ... when the contracting officer determines that price adjustment provisions are necessary either to protect the contractor and the Government against significant economic fluctuations in labor or material costs or to provide

for contract price adjustment in the event of changes in the contractor's established prices.

6. In support of its position, MAPCO offers the recent declarations of Etha Quinn, Lawrence Rizzi and Hugh Witt, who each had varying responsibilities in the drafting and publishing of the FAR. However, post hoc statements by drafting officials as to the administrative history and underlying intent of federal regulations hold no probative value, especially when uttered "in the context of a vigorous dispute." *Honeywell, Inc. v. United States,* 228 Ct.Cl. 591, 595, 661 F.2d 182 (1981). In any event, these statements are unnecessary for the court to reach the conclusion that the clauses B19.22 and B19.33 contravene the regulations.

to succeed, the court would have to assume that the compilers intended to alter the meaning of the phrase "established prices" by reversing the order of the subparagraphs. This we decline to do, in light of the limited mandate of the FAR committee.

Other portions of the regulations also indicate that the phrase "established prices" refers to the contractor's established prices. The standard EPA clauses for "Adjustments based on established prices" authorized under § 16.203–4 are set out in FAR § 52.216–2 and § 52.216–3. These standard clauses base adjustments to contract price on fluctuations in the contractor's established prices. For example, the standard EPA clause set out at § 52.-216–2 provides, in part:

(a) The Contractor warrants that the unit price stated in the Schedule for _____ [*offeror insert Schedule line item number*] is not in excess of the *Contractor's applicable established price* in effect on the contract date for like quantities of the same item.... The term "established price" means a price that (1) is an established catalog or market price for a commercial item sold in substantial quantities to the general public, (2) meets the criteria of subsection 15.804–3 of the Federal Acquisition Regulation (FAR), and (3) is the net price after applying any standard trade discounts offered by the Contractor.

FAR § 52.216–2 ("Economic Price Adjustment—Standard Supplies") (emphasis added). References to the contractor's established price also occur in §§ 52.216–2(b), 52.216–2(c), 52.216–3(a), 52.216–3(b), and 52.216–3(c). In these clauses, the terms "contractor's established price" and "established price" are used interchangeably. No standard clause exists to support defendant's conclusion. Each standard EPA clause reflects the mandates of the § 16.-203–3 "Limitations" provision. *See* 48 C.F.R. § 52.216–2 to –4. While it is not necessary that the "agency-prescribed" clauses available to DFSC mirror precisely the verbiage in § 16.203–3, "agency-prescribed" EPA clauses must reflect the concepts underlying that regulation.

Moreover, the PMM Index could hardly be described as reflecting "established prices." Although defendant argues that the PMM Index constitutes an "established catalog or market price" because it is a published summary of prices on the open market, the meaning of "catalog or market price" in the FAR, as clarified by § 15.804–3, does not support defendant's interpretation.

Regarding catalog prices, § 15.804–3 provides as follows:

"Established catalog prices" must be recorded in a form regularly maintained by the manufacturer or vendor. This form may be a catalog, price list, schedule, or other verifiable and established record. The record must (i) be published or otherwise available for customer inspection and (ii) state current or last sales price to a significant number of buyers constituting the general public.

48 C.F.R. § 15.804–3(c)(1) (citations omitted). The EPA clauses in question are not based on catalog prices because the PMM Index is not a catalog, nor does it reflect an "established catalog price." It is not maintained by MAPCO, nor does it state MAPCO's prices to buyers in the general public.

Regarding market prices, § 15.804–3 provides as follows:

"Established market prices" are current prices that (i) are established in the course of ordinary and usual trade between buyers and sellers free to bargain and (ii) can be substantiated by data from sources independent of the manufacturer or vendor.

48 C.F.R. § 15.804–3(c)(2). The two EPA clauses in this case are not based on market prices because the PMM Index does not reflect an "established market price." The index is an amalgamation of the previous month's petroleum sales data. It is not, as § 15.804–3(c)(2) contemplates, determinative of any particular corporation's current prices.

The first two meanings Webster's provides for the term "establish" are "to make stable; make firm; settle" and "to order, ordain, or enact (a law, statute, etc.) permanently." WEBSTER'S NEW WORLD

DICTIONARY 465 (3d college ed. 1988). For a price to be "established" therefore, a purchaser would have to have assurance that he could go to a particular vendor and insist on the advertised price. An average of month-old sales in no sense creates an established price. The index itself does not reflect any specific vendor's current price. In sum, the index at issue is neither the contractor's, nor does it reflect an established price.

Defendant's contention that the PMM Index constitutes an "established price" is further diminished by the language in § 16.203–1 describing the three types of permissible EPA clauses. The regulations allow for EPA clauses to be based on "established prices," "actual costs of labor or material," or "cost indexes of labor or material." Although § 16.203–1(c) refers to the use of an index, § 16.203–1(a) does not. "Where particular language is used in one section [of the regulations] but not another, the term or its equivalent should not be implied where it is excluded." *United States v. Heller*, 635 F.2d 848, 855 n. 12 (Temp.Emer.Ct.App.1980) (*citing FTC v. Sun Oil Co.*, 371 U.S. 505, 514, 83 S.Ct. 358, 364, 9 L.Ed.2d 466 (1963); *M. Kraus & Bros., Inc. v. United States*, 327 U.S. 614, 625–26, 66 S.Ct. 705, 709, 90 L.Ed. 894 (1946); *Bott v. American Hydrocarbon Corp.*, 458 F.2d 229, 233 (5th Cir.1972)), *on remand, United States v. Heller*, 542 F.Supp. 157 (D.C.Mass.1982), *vacated on other grounds, United States v. Heller*, 726 F.2d 756 (Temp.Emer.Ct.App.1983). Because the regulations specifically use the term "index" in the section on cost indexes, we cannot imply the term "index" in the term "established prices."

■ Defendant's second argument that the PMM Index is a valid escalator fitting within the descriptions of FAR § 16.203–1 is that it constitutes a cost index within the meaning of § 16.203–1(c),[7] "Adjustments based on cost indexes of labor or material." The Government states:

Contract clauses based upon indexes very similar to the PMM have routinely

been sustained. *See, e.g., Glopak Corp. v. United States*, 851 F.2d [334,] 336 [ (Fed.Cir.1988) ] (Producer's Price Index [ ("PPI") ] for polyethylene resin prepared by the United States Department of Labor (DOL)); *American Transparents Plastic Corp.*, 83–2 [Comp. Gen.] ¶ 539 at 2 [ (Nov. 8, 1983) ] (DOL's PPI for polyethylene resin).

Neither of these cases support defendant's position that the definitions of price indexes and cost indexes are interchangeable. The regulations specifically use the word "index" to refer to cost but not price, considering the two as separate terms. *See* FAR § 15.801 (defining "cost analysis," "price," and "price analysis" with respect to cost and price negotiation policies and procedures).

Moreover, defendant is incorrect in its assertion that the index used here is "similar to" those used as escalators for EPA clauses in *Glopak* and *American Transparents*. The contracts in those two cases were for the supply of plastic bags to the GSA. The PPI upon which the EPA clauses were based was an average of sales prices for polyethylene resin, a raw material used in the production of the bags. The price of the resin was part of the contractor's costs, not the contractor's prices. Thus, unlike clauses B19.22 and B19.33, the EPA clauses in *Glopak* and *American Transparents* clearly constitute an adjustment based on a cost index of material within the meaning of § 16.203–1(c).

*B. FAR § 16.203–3*

■ Additionally, MAPCO argues, clauses B19.22 and B19.33 contravene the "Limitations" provision, FAR § 16.203–3. It asserts that the EPA clauses in this case are not, as § 16.203–3 mandates, drafted "to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." Therefore, according to MAPCO, the clauses are prohibited.

---

7. The Government does not contend that the PMM Index is based on actual costs of labor or

material within the meaning of FAR § 16.203–1(b).

The Government responds that once DFSC determined that an EPA clause was warranted, it had discretion to abandon the previously discussed standard EPA clauses set out in FAR § 52.216 in favor of its own "agency-prescribed clause" outside the descriptions of § 16.203-1 and exempt from the requirements of § 16.203-3, the "Limitations" provision. According to defendant, § 16.203-3 requires only that contracting officers make a threshold determination whether there will be a need "to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." Once that determination is made, however, contracting officers are free to insert a clause to further any purpose they deem appropriate, so long as the agency sanctions the insertion. The Government argues that § 16.203-3 only prevents contracting officers from using *any* EPA clause at all unless they determine that one of those two needs exists. It claims, moreover, that the goals of the regulation would not be served by an EPA clause tied to the contractor's established prices, and that such clauses are disfavored because a contractor could raise his prices without regard to market conditions.[8]

The Government is correct that the contracting officer may replace the standard EPA clauses for an "agency-prescribed clause" if the officer deems the standard clauses inappropriate. FAR § 16.203-4(a). However, we cannot accept the additional step in defendant's logic—namely, that the "Limitations" section places no restrictions on the clause to be inserted once the contracting officer discards the standard clauses. Section 16.203-3 does not merely call for a determination as to whether the parties will require protection from cost fluctuations or adjustment for changes in the contractor's established prices. It mandates that the officer may only enter a fixed-price contract with an EPA clause when such a contract "is necessary" to effectuate that protection or adjustment. It would be folly if an EPA clause could only be utilized if one of the two mischiefs described by the "Limitations" provision were present, but then the solution were not limited to addressing that mischief. Logically, therefore, the purpose of using an EPA clause is to make adjustments specifically to meet the two forms of instability set out in § 16.203-3. Otherwise, the word "Limitations" is emptied of meaning.

Defendant, however, questions whether the "Limitations" provision sets forth the only purposes for using an EPA clause. It claims that the clauses at issue were properly intended to provide a common basis on which the bids could be evaluated and to ensure that the low bidder remained low throughout the term of the contract. The Government notes that until 1981, DFSC contracts contained EPA clauses based on the contractor's crude oil acquisition costs. In 1981, however, DFSC began to complain of the difficulty it encountered in comparing the bids from different offerors because each offeror relied on a different escalator in its bid. Because of these difficulties, DFSC decided to use market price summaries of the contract end items as escalators in its fuel supply contracts instead of acquisition costs. Defendant argues that it was within the discretion of DFSC to change its policy in order to use what it calls a more common escalator. While common escalation and bid evaluation are certainly legitimate goals, those objectives do not put the clauses in question beyond the reach of the applicable regulations. For the "Limitations" section to have an effect, it must serve not only as an entry point for using an EPA clause, but also as the method to justify the clause actually used.

In any event, defendant's government-oriented view of the purpose of an EPA clause is much more cramped than either the "Limitations" clause would suggest, or

---

8. Whether such clauses are disfavored is irrelevant. They would be permitted under the FAR. Whether they are in fact used is up to the contracting officer. In any event, defendant's argument is unsound. FAR § 16.203-2 provides that "[p]rice adjustments based on established prices should normally be restricted to industry-wide contingencies."

prior cases indicate. The courts and boards that have addressed this question have universally found that the purpose of an EPA clause is to divide the risk of economic uncertainty between the parties. *Beta Sys. v. United States*, 838 F.2d 1179, 1185 (Fed.Cir.1988); *Craft Mach. Works, Inc.*, 90–3 B.C.A. (CCH) ¶ 23,095 at 115,-967–69, 1990 WL 133158 (ASBCA June 29, 1990); *Gale Barstow, Inc.*, 86–2 B.C.A. (CCH) ¶ 18,758, 1986 WL 19640 (ASBCA Jan. 24, 1986). Without an EPA clause, the contractor would be forced to submit a higher bid to include a contingency to cover any unexpected increases in its costs. By using an EPA clause, the Government is assured of not having to pay that contingency. In fact, both the FAR [9] and the MAPCO contract clauses at issue [10] prohibit the contractor from including such a contingency.

Unaccountably, however, defendant contends that the real cause of MAPCO's losses was its failure to bid higher enough to cover unexpected deviations in the price escalator relative to its costs.[11] *See Craft Mach. Works, Inc.*, 90–3 B.C.A. (CCH) ¶ 23,095, 1990 WL 133158 (ASBCA June 29, 1990); *but see American Transparents Plastic Corp.*, 83–2 Comp. Gen. ¶ 539 (Nov. 8, 1983).[12] Further, defendant argues that

**9.** FAR § 16.203–2, entitled "Application," provides:

A fixed price contract with economic price adjustment may be used when (i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance, and (ii) contingencies that would otherwise be included in the contract price can be identified and covered separately in the contract....

(a) In establishing the base level from which adjustment will be made, the contracting officer shall ensure that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested by the contractor under economic price adjustment clause.

**10.** Clauses B19.22 and B19.33 both provide that "[t]he Contractor represents that the unit prices set forth in this contract do not include any contingency allowance to cover the possibility of [reference price] increases ... in the Contractor's bid or proposal."

**11.** During the course of performance, MAPCO registered several complaints with the contracting officer which stated that escalation by means of the PMM Index was causing it to lose money. In response, a DFSC official wrote a memorandum to the contracting officer asserting that MAPCO's problems were "self-inflicted." The memorandum states:

[W]hile assuming a constant price/cost relationship, MAPCO in 1986 bid very low at a time when that relationship had already deviated greatly from its historical norm. The return of the price/cost relationship to its historical level has put MAPCO in a price/cost squeeze because their prices are escalated on commercial prices (which generally declined) while they based their bid prices on costs (which rose).

**12.** In *Craft*, the Government argued a position similar to that which it now argues here. The Board addressed the argument as follows:

The Government recognizes that the economic relief offered by its [EPA] clause is wanting from an overall inflation perspective, but argues that appellant has no reason to complain since the Government placed it on notice of this fact, and appellant failed to place "contingencies" in its bid to account for this less-then-comprehensive [sic] treatment. However, the Government ignores the fact that the very purpose of the EPA clause, as stated in the regulations, is to *eliminate* contingencies from a bid that would otherwise be included due to projected long term market instability, and to cover them separately under the EPA clause, FAR 16.203–2. Indeed, under FAR 16.203–2(a), the contracting officer is tasked to insure that continguencies [sic] are not duplicated by the contractor by their inclusion "in both the base price and the adjustment requested...." This raises the serious question [of] whether the Government's purported encouragement of contingencies is consistent with its own regulations. *Craft Mach. Works*, 90–3 B.C.A. at 115,969 (emphasis in original).

Defendant argues that this language is dicta and asks us to apply the reasoning of *American Transparents* instead. Defendant claims that *American Transparents* supports its position that contingencies are allowed in bids for contracts with EPA clauses. In *American Transparents*, the Comptroller General found that the presence of an EPA clause did not preclude a bidder from formulating a rational bid. The Comptroller General stated:

The purpose for including an EPA clause is to protect bidders to some extent against unexpected price increases and to reduce the necessity for contingency amounts in their bid prices. However, to the extent that the EPA clause does not achieve that result from the bidder's standpoint, it is the bidder's responsibility to project costs and to include in the basic contract price a factor covering any otherwise uncompensated cost increases.

*American Transparents*, 83–2 Comp.Gen. at 6.

"FAR § 16.203–2(ii), by its own terms, is permissive and does not require that all contingencies be covered." But what is permissive about FAR § 16.203–2 is whether an EPA clause may be used at all, not whether the contractor may include a contingency in its bid once an EPA clause is chosen. The compulsory nature of the regulation's prohibition on contingencies could not be more unambiguous than the statement that "the contracting officer *shall ensure* that contingency allowances are not duplicated by inclusion in both the base price and the adjustment requested under [the] economic price adjustment clause." FAR § 16.203–2(a) (emphasis added).

▇ Defendant further argues that we should defer to the discretion of the contracting officer in developing and incorporating B19.22 and B19.33 into MAPCO's contract because the officer acted in good faith. Deference to the contracting officer's discretion is not always appropriate, however. *See Caiola v. Carroll*, 851 F.2d 395, 399 (D.C.Cir.1988). In *Caiola*, the Court of Appeals for the District of Columbia refused to defer interpretation of FAR § 9.406–2 to an official of the Defense Logistics Agency ("DLA") who debarred the president and secretary of a contracting corporation from entering further business with the federal government. Of the *Caiola* court's three rationales for disregarding the official's interpretation, the first two directly apply to this case:

> First, the [FAR] regulation was written and promulgated not only by DOD, but by GSA and NASA as well. The diffusion of the interpretive authority

among several agencies, and the possibility of inconsistent interpretations, weaken the case for deference. Second, the only agency official to construe FAR 9.406–5(b) was ... the DLA's debarring official, *not* the head of the agency. While [the debarring official]'s interpretation is, of course, entitled to a "modicum of respect" in this court, we need not accord it dispositive weight.

*Caiola*, 851 F.2d at 399 (emphasis in original) (citations omitted). Like the controlling regulation in *Caiola*, FAR Part 16 was "written and promulgated not only by DOD, but by GSA and NASA as well." The authority to interpret Part 16 is equally diffuse. *See* "Establishing the Federal Acquisition Regulation," 48 Fed.Reg. 42,-102 (1983) (as codified at 48 C.F.R. §§ 1–99). Also, neither the contracting officer nor the drafters of B19.22 and B19.33 have any more authority to interpret the FAR than did the debarring officer in *Caiola*. None of them is head of the DOD. This court will not grant any weight to the Government's application of the regulations in the present case, when the result would be at odds with the plain meaning of the regulations.

### C. FAR Subpart 16.5

In its reply brief, and as more clearly articulated in its post-oral-argument supplementary briefs, defendant has substantially altered its argument. It now contends in the alternative that the contract was not a fixed price contract pursuant to Subpart 16.2, but rather was an indefinite-delivery indefinite-quantity contract within the scope of FAR Subpart 16.5.[13] Accord-

---

Although the bidding in *American Transparents* took place prior to May 26, 1983, the regulations construed here were promulgated on September 9, 1983. The regulation in effect in *American Transparents* provided: "[i]n the establishment of the base levels from which adjustment will operate, contingency allowances shall be eliminated from the base to be set forth in the contract to the extent that adjustment is provided for any particular contingency." 41 C.F.R. § 3.404–3 (1981). Thus, at the time *American Transparents* was decided, the regulations prohibited contingencies only to the extent they were covered by the EPA clause. Under the FAR, the prohibition on contingencies is absolute. Because *Craft* is more recent and

involved the regulation at issue in the present case, its reasoning is more persuasive than that of *American Transparents*.

13. FAR § 16.501(a) provides for "three types of indefinite-delivery contracts—definite-quantity contracts, requirements contracts, and indefinite-quantity contracts." Section 16.504(a) describes indefinite-quantity contracts as follows:

> An indefinite-quantity contract provides for an indefinite quantity, within stated limits, of specific supplies or services to be furnished during a fixed period, with deliveries to be scheduled by placing orders with the contractor.

ing to defendant, clauses B19.22 and B19.33 are acceptable under that subpart "separate and apart from the authority granted by FAR Subpart 16.2."

 The Government cites the court to three clauses included within the solicitation which allegedly indicate that an indefinite-quantity contract was contemplated.[14] Defendant argues that these three clauses are "consistent with" or "substantially similar to" the three clauses that FAR § 16.-505 requires to be included in indefinite-quantity contracts.[15] MAPCO's objection to this characterization focuses on clause F1.08, the only clause of the three that is not an authorized deviation from the standard clauses pursuant to FAR Subpart 1.4. MAPCO disputes that clause F1.08 is "substantially the same as" the clause at FAR § 52.216–19 as required by § 16.505(b). Although there may be some basis for this assertion, for the reasons stated below, it is not fundamental to the holding. We will assume, without deciding, that defendant has established that an indefinite-delivery indefinite-quantity contract has been created. The real problem with defendant's alternative theory is that the type of indefinite-delivery indefinite-quantity contract to which the parties allegedly agreed does not justify defendant's use of clauses B19.22 and B19.33.

Defendant points to FAR § 16.501(c), which delineates four types of pricing mechanisms when contemplating an indefinite-delivery contract:

> Indefinite-delivery contracts may provide for firm fixed prices (see 16.202),

(1) The contract shall require the Government to order and the contractor to furnish at least a stated minimum quantity of supplies or services and, if and as ordered, the contractor to furnish any additional quantities, not to exceed a stated minimum. The contracting officer may obtain the basis for the maximum from records of previous requirements and consumption, or by other means, but the maximum quantity should be realistic an based on the most current information available.
(2) To ensure that the contract is binding, the minimum quantity must be more than a nominal quantity, but it should not exceed the amount that the Government is fairly certain to order.
(3) The contract may also specify maximum or minimum quantities that the Government

fixed prices with economic price adjustment (see 16.203), fixed prices with prospective redetermination (see 16.205), or prices based on catalog or market prices (see 15.804–3(c)). When prices are based on catalog or market prices, the price to be paid may be determined by establishing an adjustment factor and applying it to the price in industrywide pricing guides or manufacturers' price catalogs. Normally, the adjustment factor will be a fixed percentage discount to be applied to the price in effect on the date of each order.

48 C.F.R. § 16.501(c). Defendant suggests that the last of these four options—contracts based on "catalog or market prices"—authorizes its use of the PMM Index as a market price escalator in its contract with MAPCO. This is a distortion of FAR § 16.501(c), however. The fourth alternative refers to "[i]ndefinite-delivery contracts ... provid[ing] for ... prices based on catalog or market prices." It omits the element of a fixed price. The catalog or market price becomes the fixed price at time of consummation of the particular order. This is distinct from the first option, "[i]ndefinite-delivery contracts ... providing for ... firm fixed prices with economic price adjustment (see 16.203)."

 Even if "catalog or market prices" in § 16.501(c) are not limited to the contractor's established catalog or market prices, as was the case with § 16.203,[16] the simple answer to defendant's suggestion is that the fourth alternative does not describe the contract at bar. The parties plainly utilized

may order under each delivery order and the maximum that it may order during a specific period of time.

14. Clauses I212 ORDERING, F1.08 DELIVERIES AND CONTRACT PERIOD, and I81.05 INDEFINITE QUANTITY: SCOPE OF CONTRACT.

15. *See* FAR § 16.505(a), (b), and (e); FAR §§ 52.216–18, –19, and –22.

16. Defendant assumes, without proving, that the clauses at issue reflect a contract price "based on market prices." However, it is far from clear that the PMM Index actually does so. *See* discussion *supra* pp. 8–9.

the first option under § 16.501(c), not the fourth. As MAPCO points out, defendant included within the solicitation the following standard clause required by FAR § 16.-105, filling in the blank as shown:

> L74(F) TYPE OF CONTRACT (APR 1984)
>
> The Government contemplates award of a *FIXED PRICE WITH ECONOMIC PRICE ADJUSTMENT* contract resulting from this solicitation. (FAR 52.216–1)

In all, no fewer than nine clauses contain references to the contract in the terms "fixed price" or "economic price adjustment" (including "EPA") or both.[17] With one exception,[18] references to "market prices" are confined to clauses discussing economic price adjustment.[19] Additionally, on March 31, 1986, less than three weeks before the solicitation was issued, the Contracting Officer, Division Chief and the Director of the DFSC approved a two-page document entitled "Acquisition Plan" which contained language largely drawn from FAR §§ 16.203–2 and –3, to wit:

> The Contracting Officer has considered the stability of market or labor conditions which are expected to exist during the period of contract performance and has determined that Economic Price Adjustment (EPA) provisions are necessary to (a) preclude the inclusion of contingencies in the contract price(s), (b) protect the contractor and the Government against significant economic fluctuations in labor or material costs, or (c) provide for contract price adjustments in the event of changes in the contractor's established prices.

Having chosen to use the mechanism of an economic price adjustment clause, defendant is obligated to comply with applicable regulations limiting its use. It offers no principled reason for not doing so.

In its final supplemental brief, defendant proposes to expand the reach of § 16.501(c)

by permitting a mutant clause—an indefinite delivery contract having fixed prices with economic price adjustment based on market prices [read 'index']. Even if such a hybrid contract served defendant's purposes, it is not contemplated by the regulations. While the Government can be commended for adaptability in conforming its argument to the developing exigencies of the case, its briefing has evolved beyond the permissible scope of the regulation.

In sum, it is plain that the parties intended a fixed price contract with economic price adjustment. Whether they also intended an indefinite-delivery indefinite-quantity contract is immaterial. Either way, the contract must comply with FAR § 16.203. As previously discussed, the present contract fails to do so.

### D. Waiver

 Defendant's final argument is that MAPCO waived its right to protest the contract by acquiescing to the Government's insistence that the PMM Index be included in this and other contracts with MAPCO. Assumption-of-the-risk analysis is not applicable under these circumstances, however. The contractor cannot, by waiver, permit the Government to enter an illegal contract. We agree with the following statement by the ASBCA: "When a contract clause drafted by the Government is inconsistent with law, whether the appellant inquired, protested, accepted or otherwise assumed any risks regarding the same is not controlling; the impropriety will not be allowed to stand." *Craft Mach. Works, Inc.,* 90–3 B.C.A. (CCH) ¶ 23,095 at 115,969, 1990 WL 133158 (ASBCA June 29, 1990); *see also Beta Sys. v. United States,* 838 F.2d 1179 (Fed.Cir. 1988); *Chris Berg, Inc. v. United States,* 192 Ct.Cl. 176, 183, 426 F.2d 314, 317 (1970).

---

**17.** Specifically, contract clauses B19.12, B19.22, B19.33, B19.36, B20.02, E5(F), L74(F), M19.05 and M71.

**18.** Clause K7.04, COST ACCOUNTING STANDARDS—EXEMPTION BASED ON ESTAB-

LISHED CATALOG OR MARKET PRICES. *See* 48 C.F.R. § 15.804–3.

**19.** Clauses B19.22 and B19.33.

### III. CONCLUSION

For the foregoing reasons, MAPCO's motion for partial summary judgment as to liability is granted and defendant's cross-motion for partial summary judgment is denied. We need not now address the remedy to be afforded plaintiff. The parties are directed to submit a joint status report by January 22, 1993, proposing dates for further proceedings on the issue of damages.