**WHITTAKER ELECTRONIC SYSTEMS, Appellant,**

v.

**John H. DALTON, Secretary of the Navy, Appellee.**

**No. 97–1027.**

United States Court of Appeals, Federal Circuit.

Sept. 16, 1997.

James J. Gallagher, McKenna & Cuneo, L.L.P., Los Angeles, CA, argued, for appellant. With him on the brief was Brian M. Regan.

Lawrence N. Minch, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, argued, for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Sharon Y. Eubanks, Deputy Director.

Before MAYER, MICHEL, and LOURIE, Circuit Judges.

MICHEL, Circuit Judge.

Whittaker Electronic Systems ("WES") appeals the June 17, 1996 decision of the Armed Services Board of Contract Appeals ("Board"), ASBCA No. 40252, affirming the Contracting Officer's denial of WES's claim for an equitable adjustment for additional money and time spent in completing a contract which WES fully performed.[1] The appeal was submitted for our decision following in camera oral argument on July 9, 1997. Because the Board's factual findings are supported by substantial evidence and its legal conclusions are correct, we affirm.[2]

## BACKGROUND

In order to train American armed forces in realistic settings, the Air Force wanted to build a "simulator" of certain Soviet long range radar. This simulator was to have the approximate operating capabilities of the Soviet radar.

By the time the procurement process for this contract (the T–11A program) started, the Air Force had discovered that meeting the stated operating capabilities of the Soviet long range radar presented severe technical difficulties.[3] Furthermore, their best estimates of the operating capabilities of the Soviet radar were actually lower than the Air Force's solicitation to potential bidders for the contract.

The Air Force contracting office received authorization to negotiate an "individual" contract for "the design, fabrication, and testing of the transmitter ..., associated data, and its integration into the total system," as well as "options ... for up to two production ... Radar systems, together with spares, special support equipment, engineering drawings, related data, publications, and contractor support." This authority to negotiate was granted under 10 U.S.C. § 2304(a) as an exception to the usual process of a competitive, advertised process with award to the lowest responsible bidder. After comments from contractors, the compensation scheme for the proposed contract was modified from fixed price (which allocates a relatively higher risk to the contractor), to a relatively lower risk, fixed price plus incentive fee.

The fixed price plus incentive fee contract eventually executed between WES's predecessor-in-interest, REL, Inc. ("REL") and the Air Force consisted of a Phase I Research and Development effort, with an option to acquire two radar systems in Phase II. REL subcontracted with Raytheon for the development of certain devices for Phase I. The subcontract was a fixed-price contract. Thus, the risk of any cost overruns in Raytheon's performance was allocated to Ray-

---

1. The original contracting agency, the Air Force, transferred the underlying contract to the Navy in 1987.

2. There are certain technical aspects relating to the defense contract in question that are classified. Although one of the appendices is classified and the argument was in camera, nothing in this opinion is classified.

3. During the procurement process, WES's predecessor-in-interest, REL, Inc. ("REL") recognized this problem when it internally produced a Risk Analysis Report which identified development of cross field amplifiers as a major risk in undertaking the contract.

theon. Raytheon delivered its portion of Phase I late, and Phase I was completed well behind schedule. Near the end of Phase I, REL reported deficits due to Raytheon's delayed delivery, and excess labor charges also due to Raytheon's delay. The Air Force, nevertheless, exercised its option to enter Phase II of the contract.

Meanwhile, WES acquired REL. WES decided to move the project production facilities from Florida to California during the performance of Phase II. This resulted in a change of personnel and the attendant difficulties in transition. Further, the Board found that, after the move to California, WES used in-house procedures more appropriate to assembly line engineering than to small scale contracts. Disputing this finding, WES points to testimony of WES employees that government inspectors insisted on formal (rather than more expeditious "redlined") drawings which are more expensive and time consuming to produce. There is also testimony, however, that it was WES's internal procedures that prohibited redlined drawings. On March 3, 1989, WES complained in a meeting with inspectors about its inability to use redlined drawings. Their use was approved and implemented by May 4, 1989.

### DISCUSSION

WES makes three types of arguments on appeal: first, that the Air Force violated statutes, regulations, and internal directives in the negotiation and drafting of the contract; second, that in the solicitation and the contract itself the government materially misrepresented the capabilities of the Soviet radar; and third, that the Air Force breached its implied duty to cooperate with REL during the performance of the contract.

### I. Standard of Review

The Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613, provides for judicial review of decisions of agency boards of contract appeals. *See* 41 U.S.C. §§ 607(g), 609. This court's standard of review of board decisions is governed by 41 U.S.C. § 609(b), which provides that board findings on any question of fact shall be final and conclusive and shall not be set aside unless fraudulent, arbitrary, capricious, "so grossly erroneous as to necessarily imply bad faith," or "not

supported by substantial evidence." *See Erickson Air Crane Co., Inc. v. United States,* 731 F.2d 810, 814 (Fed.Cir.1984); *United States v. General Elec. Corp.,* 727 F.2d 1567, 1572 (Fed.Cir.1984).

### II. Violations of Authority

A. Did the Air Force violate 10 U.S.C. § 2304(a)?

When this contract was entered into, section 2304(a) dictated that government contracts must go through formal advertising, and be awarded on a competitive bid basis, unless one of seventeen exceptions applied. In order to negotiate an individual contract rather than coordinating a competitive bid process, the contracting authority had to receive "authority to negotiate." WES argues that the Air Force violated section 2304(a) by entering into a contract that exceeded the scope of the authorization to negotiate. Specifically, WES argues that the contract between REL and the Air Force required the design and development of an entirely new radar system, whereas the negotiation authorization only extended to the design and development of a transmitter and its integration into an existing system. The Board, however, held that the language "integration into the total system" approved by the Assistant Secretary of the Air Force included whatever was necessary in order to integrate the newly designed transmitter into a working system, including the redesign of other parts of the system as necessary to achieve compatibility with the transmitter.

We agree with the government that WES's interpretation of the negotiation authorization is overly narrow. The authorization was for "the design, fabrication, and testing of the transmitter of the AN/MSQ–T11A, associated data, and its integration into the total system," as well as "options . . . for up to two production AN/MSQ–T11A Radar systems." This language encompasses a new, integrated system. However, we do not rule that WES was estopped, but that the contract terms did not exceed the authorization as correctly construed. The Board's holding that the Air Force did not violate 10 U.S.C. § 2304 is therefore affirmed. We need not and do not

reach whether any such violation would void the contract.

### B. Did the Air Force violate DAR § 1–1502(b)(ii)?

██ DAR § 1–1502 provided in pertinent part (with emphasis added):

(a) Because options require offerors to guarantee prices for definite periods of time with no assurance that the options will be exercised, their improper inclusion could result in prices which are unfair to either the Government or the contractor.

(b) *Option clauses shall not be included* in contracts, and option provisions shall not be included in solicitations *if:*

. . .

(ii) the contractor would be required to *incur undue risks* (e.g., the price or availability or necessary materials or labor is not reasonably foreseeable); . . . .

WES argues that the T–11A contract was void *ab initio* because it contained an option clause that violated DAR § 1–1502 because the option, WES asserts, allocated "undue risks" to REL, and the regulation says such clauses "shall not" be included. The Board held that WES lacked standing to challenge the government's alleged non-compliance with DAR § 1–1502(b)(ii).

██ We do not reach the issue of standing. Rather, we note that because REL failed to make a timely objection to the option clause, to any "undue risk" it believed was thereby improperly allocated to it, or assert a violation of the regulation, REL waived the right to challenge the validity of the contract under DAR § 1–1502(b)(ii). The doctrine of waiver precludes a contractor from challenging the validity of a contract, whether under a DAR or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge. *See United Int'l Investigative Servs. v. United States,* 109 F.3d 734, 738 (Fed.Cir.1997); *E. Walters & Co., Inc. v. United States,* 217 Ct.Cl. 254, 576 F.2d 362, 367–68 (1978). The fact that REL failed to complain and WES agreed without objection to take over REL's contract, substantially completing it, constituted

a waiver of the grounds for rescinding or voiding the contract because of a violation of the regulation, even assuming the option clause indeed violated the regulation.

### C. Did the Air Force violate DoD Directive 5000.1 or DAR 1–334?

██ WES's arguments that the inclusion of production options in this contract also violated DoD Directive 5000.1 and DAR § 1–334 are easily rejected. DAR § 1–334 limits the inclusion of ceiling priced production options when there is undue risk to the contractor or the government. This regulation, however, is limited on its face to "major systems," and the Board found (and WES concedes) that the radar system at issue here is not a major system. DoD Directive 5000.1, although it does say that its "management principles . . . are applicable to all programs," says nothing specifically against the inclusion of production options in development contracts, and its general management principles cannot be read to bar the type of options included here.

### III. Did the Air Force materially misrepresent the capabilities of the Soviet radar?

██ WES argues that the government misrepresented the estimated capabilities of the Soviet radar, and that this misrepresentation induced REL to enter into the contract. Although there is some evidence to support WES's contention that the government misstated the specification of the T–11A contract as "equivalent" to estimated capabilities of the Soviet radar, when they were actually significantly higher than the estimates, the Board found that the alleged misrepresentation had not acted as an inducement. We cannot say that this finding is unsupported by substantial evidence. There is testimony from both REL and Raytheon management that the representation that the T–11A specifications were equivalent to the Soviet radar capabilities did not induce REL to enter the contract, but rather that the state of the art in the United States persuaded REL to make its decision. We further note that REL knew that the contract's reference to the capabilities of the Soviet radar

was based only on estimates derived from military intelligence reports and could change from time to time based on new intelligence. It would thus be wholly unreasonable for REL to expect them to be and to remain accurate. Instead, in determining how difficult it would be to perform the contract, REL should have, as the Board found it did, relied mainly on what it knew of its own technologies and capabilities. Nor was there any term in the contract requiring the specifications not to exceed Soviet capabilities.

## IV. Did the Air Force breach its duty to cooperate?

■ Finally, WES broadly argues that the government breached its implied duty to cooperate by refusing to expand permissible production procedures during Phase II of the contract. The only specific example WES offers of an allegedly overly burdensome production procedure, however, was the requirement of formal rather than redlined drawings. However, it appears to be undisputed that, within two months of WES's first complaint, the government allowed WES to use to redlined drawings. Given its quick and responsive reaction, the government can hardly be said to have not cooperated.

## V. Conclusion

We have considered WES's other arguments and find them either unpersuasive or unnecessary to the resolution of this appeal. Therefore, for the reasons stated above, the decision of the Armed Services Board of Contract Appeals denying an equitable adjustment is

*AFFIRMED.*