**GOLD LINE REFINING, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–543 C.

United States Court of Federal Claims.

Oct. 30, 2002.

Ronald H. Uscher, Washington, DC, for plaintiff. Donald A. Tobin and Lori A. Lange, Washington, DC, of counsel.

Reginald T. Blades, Jr., with whom were Robert D. McCallum, Jr., Assistant Attorney General and David M. Cohen, Director, U.S. Department of Justice, Washington, DC, for defendant. Bernard A. Duval, Howard Kaufer and Karen E. Schools, Office of Counsel,

Defense Energy Support Center, Ft. Belvoir, VA, of counsel.

J. Keith Burt, Washington, DC, for National Petroleum & Refiners Association, amicus curiae. Cameron S. Hamrick, Michael E. Lackey, Gary A. Winters, Robert G. Slaughter and Maurice H. McBride, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

Plaintiff, Gold Line Refining, Ltd. ("Gold Line") seeks damages resulting from the use of a certain economic price adjustment (EPA) clause in its contract to supply jet fuel to the United States of America, acting through the Defense Fuel Supply Center ("DFSC" or the "government").[1] The parties have filed cross-motions for summary judgment. The National Petrochemical & Refiners Association has filed amicus curiae briefing. For the following reasons, defendant's motion is DENIED, and plaintiff's cross-motion for summary judgment is GRANTED in part and DENIED in part.

## I. Background

Gold Line operated a petroleum refinery in Lake Charles, Louisiana.[2] Complaint (Compl.) ¶ 3. Between 1991 and 1997, the government awarded a number of contracts to Gold Line for the supply of refined petro-

leum products. Defendant's Proposed Findings of Uncontroverted Facts (DPFUF) ¶ 1. Although all of the contracts contain similar EPA clauses, this action involves a challenge to the EPA clause in only one of those contracts. Id.

On April 15, 1993, DFSC issued Solicitation No. DLA600–93–R–0161 (solicitation) seeking competitive offers from petroleum refining companies for various refined petroleum products for use at locations in the Inland/West Coast and East/Gulf Coast.[3] DPFUF ¶ 2; Plaintiff's Proposed Findings of Uncontroverted Facts (PPFUF) ¶ 3. The solicitation was for a fixed-price contract with an EPA clause, specifically, Clause B19.33, Economic Price Adjustment—Published Market Price (Domestic Bulk) (DFSC Nov. 1992). DPFUF ¶ 4; PPFUF ¶ 13. Clause B19.33 outlines an interim and a final billing price (based on certain monthly reference prices) for the fuel delivered by the contractor to DFSC during a month. DPFUF ¶ 4; PPFUF ¶ 13. Pursuant to Clause B19.33, the final billing price adjusts the interim award price upward or downward. See DPFUF ¶ 7.

In response to the solicitation, Gold Line submitted an offer to supply fuel as a small disadvantaged business ("SDB").[4] As a SDB company, Gold Line was eligible to receive contract awards from the Department of De-

---

1. On or about February 1, 1998, DFSC changed its name to the Defense Energy Support Center ("DESC"). The facts recited in this opinion are as set forth in the complaint (and not contested by defendant), unless otherwise noted. Particular paragraphs of the complaint are sometimes noted for convenience of reference. Facts cited to the filings of only one party do not appear to be in dispute.

2. Gold Line, a Texas limited partnership, filed a Chapter 11 petition in the Bankruptcy Court for the Southern District of Texas, Houston Division in 1997. See Unopposed Motion of Ben B. Floyd, Trustee[,] for Leave to Amend Pleadings to Substitute As the Real Party in Interest at 1. In 1998, Gold Line filed its complaint in this action as debtor-in-possession. Id. at 1. In February 1999, Gold Line's bankruptcy case was converted to a Chapter 7 matter under the Bankruptcy Code, and Ben B. Floyd was appointed interim trustee of Gold Line's bankruptcy estate. Id. at 2. Pursuant to the Federal Rules of Bankruptcy Procedure, Mr. Floyd became the permanent

Chapter 7 Trustee of Gold Line's bankruptcy estate in March 1999. Id. By unopposed motion filed on October 8, 2002, Mr. Floyd, as trustee of Gold Line's bankruptcy estate and the proper legal representative to maintain this action, asked to be substituted as the real party in interest. Id. The court granted the motion. See Order dated October 10, 2002.

3. To meet its fuel requirements under a particular solicitation, the government generally accepts a combination of offers from multiple suppliers. DPFUF ¶ 2. For this particular solicitation, the government awarded a group of 30 contracts to meet its needs for the upcoming year. Id.

4. Gold Line submitted its offer in accordance with the Small Business Act, 15 U.S.C. §§ 631–657 (1988), the Armed Services Procurement Act, 10 U.S.C. §§ 2302–2331 (1992) and the Department of Defense Supplement to the Federal Acquisition Regulation, 48 C.F.R. Part 219 (1993). Compl. ¶ 4.

fense at prices up to ten percent (10%) above prices paid to non-SDB companies. Compl. ¶ 5.

On September 8, 1993, DFSC awarded a contract to Gold Line to supply approximately 80 million gallons of JP–4 jet fuel, a naphtha-based product manufactured to military specifications. DPFUF ¶ 3; PPFUF ¶¶ 3, 4, 9. Several weeks later DFSC amended the contract to include the delivery of an additional 18.3 million gallons of JP–4 jet fuel. DPFUF ¶ 3; PPFUF ¶ 9. On October 6, 1993, DFSC amended the contract for a second time to include the delivery of 56,095,200 gallons of JP–8 jet fuel, a kerosene-based type of military jet fuel, to certain East/Gulf Coast locations during the period April 1, 1994 through March 31, 1995. PPFUF ¶¶ 3, 10. The JP–8 fuel purchased under the second amendment to Gold Line's contract was DFSC's first purchase of JP–8 jet fuel on the U.S. Gulf Coast.[5] PPFUF ¶ 3. The award price for the JP–8 fuel was $0.607700 per gallon. PPFUF ¶ 10. In this action, Gold Line challenges only the price it was paid for the delivery of the JP–8 fuel under the second amendment to its contract.

Gold Line began its JP–8 deliveries in April 1994. PPFUF ¶ 11. By letter dated November 22, 1994, Gold Line asked DFSC to amend the contract to substitute other monthly reference prices for the JP–8 fuel deliveries.[6] PPFUF ¶ 23. Gold Line sought to substitute reference prices that it believed would reflect changes in its crude oil costs. Compl. ¶ 44; DPFUF ¶ 9; PPFUF ¶¶ 21–23. DFSC denied Gold Line's request on December 29, 1994. DPFUF ¶ 8; PPFUF ¶ 24. Gold Line completed its JP–8 deliveries on December 18, 1994. DPFUF ¶ 8; PPFUF ¶ 11.

On May 31, 1995, Gold Line submitted a certified claim to the DFSC contracting officer for alleged improper price reductions to-

taling $3,048,789.00. DPFUF ¶ 9; PPFUF ¶ 26. By amendment dated May 28, 1997, Gold Line reduced its claim to $1,477,084.00. DPFUF ¶ 9; PPFUF ¶ 27. The contracting officer issued a final decision on July 1, 1997 denying plaintiff's claim. DPFUF ¶ 11; PPFUF ¶ 29.

On June 25, 1998, Gold Line filed suit in the Court of Federal Claims challenging the amount it was paid for its JP–8 fuel deliveries. Defendant moved to dismiss on the ground that plaintiff had failed to state a claim upon which relief could be granted. By Opinion dated March 25, 1999, the court denied defendant's motion as to Gold Line's quantum valebant claim[7] and as to its claim for reformation on the ground of mutual mistake. *See Gold Line Refining, Ltd. v. United States,* 43 Fed.Cl. 291, 295–297 (1999). The court granted defendant's motion as to Gold Line's claim for reformation on the ground of unilateral mistake. *Id.* at 297.

After unsuccessful settlement discussions and delays arising from plaintiff's bankruptcy, the parties filed cross-motions for summary judgment on the legal issue of whether the EPA clause in Gold Line's contract is authorized and enforceable.

## II. Discussion

### A. Standard of Review

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. United States Court of Federal Claims Rule 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that might significantly affect the outcome of the litigation. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the nonmovant fails

---

**5.** For the preceding 30 years, DFSC's purchases on the Gulf Coast had been almost exclusively of JP–4 type jet fuel. Compl. ¶ 10.

**6.** Clause B19.33 permitted such requests. *See* Appendix to Defendant's Motion for Summary Judgment (Def.'s Mot.App.) at 4.

**7.** Plaintiff's complaint and the court's 1999 Opinion and Order addressed plaintiff's claim as a

claim in "quantum meruit" (Latin "as much as he has deserved"). Black's Law Dictionary 1255 (7th ed.1999) (Black's). While the difference carries no significant legal effect, *see Barrett Refining Corp. v. United States,* 242 F.3d 1055, 1059 n. 1 (Fed.Cir.2001), in this opinion, the court uses the term conventionally applied to payments for supplies, "quantum valebant" (Latin "as much as they were worth"). Black's at 1255.

to make a showing sufficient to establish an element of its case on which it will bear the burden of proof at trial, the movant is entitled to summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all reasonable inferences in favor of the nonmovant. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. When the case is before the court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States,* 45 Fed.Cl. 450, 457 (1999).

Contract interpretation is a question of law. *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir.1996); *Alaska Lumber & Pulp Co. v. Madigan,* 2 F.3d 389, 392 (Fed. Cir.1993). The purpose of contract interpretation is to carry out the intent of the parties. *See Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991); *Alvin, Ltd. v. United States Postal Service,* 816 F.2d 1562, 1565 (Fed.Cir.1987); *Hegeman—Harris & Co. v. United States,* 194 Ct.Cl. 574, 440 F.2d 1009, 1014 (1971). The intention of the parties to a contract controls its interpretation. *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988).

### B. FAR Regulatory Framework for EPA Clauses

The Federal Acquisition Regulations (FAR) authorize the use of economic price adjustments in a fixed-price contract to "provide[ ] for [the] upward and downward revision of the stated contract price upon the occurrence of specified contingencies." 48 C.F.R. § 16.203–1. The FAR recognizes three general types of economic price adjustments:

(a) Adjustments based on established prices. These price adjustments are based on increases or decreases from an agreed-upon level in published or otherwise established prices of specific items or the contract end items.

(b) Adjustments based on actual costs of labor or material. These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.

(c) Adjustments based on cost indexes of labor or material. These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

FAR 16.203–1.

Use of an economic price adjustment clause in a fixed-price contract is appropriate "when (i) there is serious doubt concerning the stability of market or labor conditions that will exist during an extended period of contract performance, and (ii) contingencies that would otherwise be included in the contract price can be identified and covered separately in the contract." FAR 16.203–2. As a threshold matter, the contracting officer must determine that use of an economic price adjustment clause "is necessary either to protect the contractor and the Government against significant fluctuations in labor or material costs or to provide for contract price adjustment in the event of changes in the contractor's established prices." FAR 16.203–3.

Price adjustments based on established prices should normally be restricted to industry-wide contingencies. FAR 16.203–2. Price adjustments based on labor and material costs should be limited to contingencies beyond the contractor's control. *Id.*

### C. How Clause B19.33 Operates

The EPA clause in this contract is set forth in Clause B19.33. *See* Defendant's Motion for Summary Judgment (Def.'s Mot.) at 4; Def.'s Mot.App. at 3–7. Clause B19.33 provides for an interim and a final billing price for the fuel delivered by the contractor to DFSC during a month. DPFUF ¶ 4; PPFUF ¶ 13. While FAR 16.203–3 contemplates that contract price adjustments address either "significant fluctuations in labor or material costs or ... changes in the contractor's established prices," B19.33 makes adjustments based on the market prices of other petroleum end products.

DFSC calculated the interim billing price for the JP–8 fuel based on fuel prices published in the Oil Price Information Service (OPIS), a petroleum industry newsletter, at

the end of the month prior to delivery. DPFUF ¶ 4; PPFUF ¶ 14. The contract contained a formula to calculate the interim prices. PPFUF ¶ 14. For Gold Line's JP–8 deliveries, the formula was the average of commercial jet fuel prices in Houston, Texas and Linden, New Jersey, as published in OPIS. *Id.*

DFSC calculated the final billing price for the JP–8 fuel based on the Petroleum Marketing Monthly ("PMM"), an official publication of the United States Department of Energy. PPFUF ¶ 15. PMM is a monthly amalgamation of petroleum sales data derived from submission of sales data from refiners to the Department of Energy on a monthly basis. DPFUF ¶ 6; PPFUF ¶ 16. PMM reflects petroleum sales information grouped by different geographic regions in the United States known as Petroleum Administration for Defense Districts ("PADDs"). PPFUF ¶ 18. The final billing price for Gold Line's JP–8 fuel was the average of the sales prices of "Kerosene Type Jet Fuel Sales to End Users" from two different PADDs. *Id.* As stated in its solicitation, DFSC determined the final billing price three months after the interim billing price. PPFUF ¶ 15. Pursuant to Clause B19.33, the final billing price adjusts the interim award price upward or downward. *Id.*

## D. The Enforceability of Clause B19.33

The leading decision on the enforceability of an EPA clause in a substantially similar context is *MAPCO Alaska Petroleum, Inc. v. United States,* 27 Fed.Cl. 405 (1992) (holding that a substantially similar EPA clause was unauthorized under the FAR). When the government moved to dismiss this action for failure to state a claim, it declined to challenge the *MAPCO* holding, although it did not concede that *MAPCO* was correctly de-

cided. *Gold Line Refining, Ltd. v. United States,* 43 Fed.Cl. 291, 292 n. 2 (1999). In denying the government's motion to dismiss, this court observed that the government's use of the EPA clause in this contract "is in direct conflict with the FAR." *Gold Line Refining,* 43 Fed.Cl. at 296 (citing *MAPCO,* 27 Fed.Cl. 405). This court decided that "by choosing to use a fixed price contract with an EPA clause, the government is bound by the relevant FAR provisions." *Gold Line Refining,* 43 Fed.Cl. at 297 n. 8.

In its pending motion for summary judgment, however, DESC seeks reconsideration of this court's prior ruling.[8] The government attempts to distinguish the *MAPCO* case, *see* Def.'s Mot. at 18–19, and persuade the court that the EPA clause in Gold Line's contract is authorized by the FAR and enforceable. *Id.* at 10–22.

### 1. Prior Authorities

To provide fuller context for the parties' positions in this dispute, the court briefly reviews several prior decisions of the court addressing the legal issue presented here.

In *MAPCO,* the plaintiff-contractor challenged the legality of the EPA clauses contained in its fuel supply contract with DFSC. 27 Fed.Cl. at 406. Plaintiff complained that the EPA clauses [9] using the PMM Index as the price escalator were illegal because the PMM Index did not comply with procurement regulations. *Id.* at 407–08. After careful analysis of the relevant FAR provisions, review of the legislative history of the provisions, examination of the record, and consideration of the parties' arguments, the Court of Federal Claims determined that the EPA clauses were "plainly inconsistent with the FAR." *Id.* at 408. The court found that, "[h]aving chosen to use the mechanism of an

---

8. In its Motion for Summary Judgment, the government addresses this court's prior ruling in two brief references. Def.'s Mot. at 2, 15 n. 1 (*"But see Gold Line Refining v. United States,* 43 Fed.Cl. 291, 296 n. 8 (1999)"). In its reply, defendant acknowledges that it seeks, and argues directly for, reconsideration. Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Defendant's Opposition to Plaintiff's Cross Motion for Partial Summary Judgment (Def.'s Reply) at 5, 23.

9. One of the challenged EPA clauses was Clause B19.33. *MAPCO,* 27 Fed. Cl. at 407. The parties in this action agree that Clause B19.33 in Gold Line's contract is "virtually identical" to the clause in *MAPCO. See* Def.'s Mot. at 13; Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Cross Motion for Partial Summary Judgment (Pl.'s Opp.) at 2.

economic price adjustment clause, defendant [was] obligated to comply with applicable regulations limiting its use.... [but that defendant] offer[ed] no principled reason for not doing so." *Id.* at 416.

Subsequently, in *Barrett Refining Corp. v. United States*, 42 Fed.Cl. 128 (1998), another plaintiff-contractor sought damages from the DFSC on the ground that the government had used an unauthorized EPA clause, specifically Clause B19.33, in its fuel supply contract. *Barrett Refining Corp.*, 42 Fed.Cl. at 134. In that case, the government "concede[d] that the pricing mechanisms used in the contracts ... were unauthorized." *Id.* at 130. On appeal, the Federal Circuit affirmed that the Court of Federal Claims properly exercised jurisdiction over plaintiff's claims for quantum valebant relief because plaintiff's claim was premised on an implied-in-fact contract. *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1059 (Fed.Cir. 2001), *vacating part of decision on other grounds and remanding*, 42 Fed.Cl. 128 (1998), *on remand*, 50 Fed.Cl. 567 (2001).

More recently, in an unpublished decision, *Pride Cos., L.P. v. United States*, No. 95–597 C, 2000 U.S. Claims LEXIS 213, *1 (May 10, 2000), the Court of Federal Claims considered an action by a plaintiff-contractor against DFSC arising out of a series of fuel supply contracts containing the same "standard" EPA clause found by the court in *MAPCO* to be illegal. *Id.* at **1–2. Because the government conceded that the contracts were illegal, disputing instead whether plaintiff suffered harm, the court's Opinion and

Order focused on damages rather than liability. *Id.* at *3.

2. Whether FAR 16.203–1 is Mandatory

Defendant's argument begins with an interpretation of FAR 16.203–1, the provision describing EPA clauses, as non-mandatory. Defendant contends that the · sentence " '[e]conomic price adjustment provisions are of three general types,' is a simple declarative statement ... [lacking] any mandatory, prohibitory, or exclusionary language." Def.'s Mot. at 14 (quoting FAR 16.203–1). Defendant notes that the FAR does not explicitly prohibit the use of an alternative EPA clause and argues that "if a clause is not prohibited, it is permitted." *Id.* at 15. Defendant relies on FAR 1.102(d) as support for its interpretation of the regulations be- ·cause that FAR provision "directs members of the acquisition team ... to exercise personal initiative and sound business judgment and authorizes them to do whatever makes good business sense, is consistent with the FAR, and is not prohibited." [10] Def.'s Mot. at 10.

Plaintiff contends that defendant's reliance on FAR 1.102(d) for interpretive guidance is misplaced because that provision was not added to the FAR until July 1995, nearly two years after the award of Gold Line's contract. Pl.'s Opp. at 10. As plaintiff points out, FAR 1.401 was the regulation governing the use of agency-prescribed EPA clauses at the time of Gold Line's contract. *Id.* Plaintiff also correctly argues that "FAR 1.401 expressly precludes the use of a contract procedure or clause that is inconsistent with the FAR in the absence of an authorized deviation." [11]

---

**10.** FAR 1.102 sets forth a statement of guiding principles for the FAR. As articulated in subsection (d) of the provision:

> The role of each member of the Acquisition Team is to exercise personal initiative and sound business judgment in providing the best value product or service to meet the customer's needs. In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority.

FAR 1.102(d).

**11.** FAR 1.401 defined the term "deviation" to mean any one or combination of the following:

> (a) The issuance or use of a policy, procedure, solicitation provision ..., contract clause ..., method, or practice of conducting acquisition actions of any kind at any stage of the acquisition process that is inconsistent with the FAR.
> (b) The omission of any solicitation provision or contract clause when its prescription requires its use.
> (c) The use of any solicitation provision or contract clause with modified or alternate language that is not authorized by the FAR ....
> (d) The use of a solicitation provision or contract clause prescribed by the FAR on a substantially as follows or substantially the same as basis ..., if such use is inconsistent with the

Pl.'s Opp. at 10. Plaintiff further points out that "an unauthorized procedure or clause is legally unenforceable." *Id.* (citing *Beta Sys., Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988); *McDonnell Douglas Corp. v. United States,* 229 Ct.Cl. 323, 670 F.2d 156, 159 (1982); *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 367, *aff'd,* 39 F.3d 1198 (Fed.Cir.1994)). Because DFSC did not have an authorized deviation to use Clause B19.33, plaintiff urges that Clause B19.33 is legally unenforceable Pl.'s Opp. at 10.

### 3. Clause B19.33 is Not an Authorized Alternative EPA Clause

Both parties acknowledge that some flexibility in selecting an EPA clause is afforded to the contracting officer by FAR 16.203–4, but the parties contest the scope of that flexibility.

Plaintiff notes that FAR 16.203–4(a) permits a contracting officer to replace the standard EPA clause with an agency-prescribed clause if the contracting officer determines that the standard clause is inappropriate, but argues that the contracting officer's discretion is far from unfettered. Pl.'s Opp. at 11. Plaintiff argues that FAR 16.203–3 restricts the type of economic considerations upon which an EPA clause may be based to either fluctuations in labor or material costs or changes in the contractor's established prices. Pl.'s Opp. at 14. Plaintiff asserts that Clause B19.33 violates the FAR because the clause is not one of the defined types of EPA clauses authorized for use under FAR 16.203–3 but is a market-based EPA clause. *See* Pl.'s Opp. at 10, 13–18.

Defendant concedes that Clause B19.33 is not one of the types of clauses identified in FAR 16.203–1, but rather "an alternative EPA clause." Def.'s Mot. at 13. Defendant insists instead that Clause B19.33 is enforceable because it operated consistently with the objectives of the FAR for EPA clauses. Def.'s Mot. at 16–19. Defendant contends that the EPA clause in Gold Line's contract "protected Gold Line from fluctuations in its crude oil costs better than a clause that would have made adjustments using Gold Line's actual crude oil costs." Def.'s Mot. at 17. Because "[m]arket-based EPA provisions in purpose and in effect very closely resemble the EPA provisions described in the FAR," Def.'s Mot. at 18, defendant reasons that "the clause contained in Gold Line's contract was authorized and is enforceable." Def.'s Mot. at 19.

Whether a "market-based" EPA provision, whatever its effect, is permitted by the FAR is, in the first instance, a question of the proper interpretation of the regulation.[12] As defined in FAR 16.203–1, titled "Description," an EPA clause permits the revision of a stated contract price "upon the occurrence of specified contingencies." FAR 16.203–1. FAR Subpart 16.2 authorizes EPA clauses that "are of three general types," specifically: (1) adjustments based on established prices, (2) adjustments based on actual costs of labor or material, and (3) adjustments based on cost indexes of labor or material. FAR 16.203–1.

The particular circumstances in which an EPA clause may be used are addressed in FAR 16.203–3. FAR 16.203–3 is a provision of limitation on the use of EPA clauses. FAR 16.203–3 states that a fixed price contract with economic price adjustment "shall not be used unless the contracting officer determines that it is necessary," and sets forth two circumstances in which EPA clauses may be used: "either" to protect the

---

intent, principle, or substance of the prescription or related coverage on the subject matter in the FAR.

(e) The authorization of lesser or greater limitations on the use of any solicitation provision, contract clause, policy, or procedure prescribed by the FAR.

(f) The issuance of policies or procedures that govern the contracting process or otherwise control contracting relationships that are not incorporated into agency acquisition regulations in accordance with 1.301(a).

FAR 1.401 (1991).

**12.** The rules of statutory construction require that "the meaning of the statute must, in first instance, be sought in the language in which the act is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (citations omitted); 2A Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 46.01, at 113 (6th ed.2000).

contracting parties against significant fluctuations in labor or material costs "or" to provide for contract price adjustments based on changes in the contractor's established prices. FAR 16.203–3.

The Court of Federal Claims in *MAPCO* specifically addressed how FAR 16.203–3—by limiting the circumstances in which an EPA clause may be used—also serves as a limitation on the types of clauses that may be used:

> Section 16.203–3 does not merely call for a determination as to whether the parties will require protection from cost fluctuations or adjustment for changes in the contractor's established prices. It mandates that the officer may only enter a fixed-price contract with an EPA clause when such a contract "is necessary" to effectuate that protection or adjustment. It would be folly if an EPA clause could only be utilized if one of the two mischiefs described by the "Limitations" provision were present, but then the solution were not limited to addressing that mischief. Logically, therefore, the purpose of using an EPA clause is to make adjustments specifically to meet the two forms of instability set out in § 16.203–3. Otherwise, the word "Limitations" is emptied of meaning.

*MAPCO,* 27 Fed.Cl. at 412.

■■ The rules of statutory construction provide that, if a statute provides that a thing shall be done in a certain way, there is a rebuttable presumption under the rules of statutory construction that an implied prohibition against doing that thing in any other way exists. *See* 2A Singer, *Statutory Construction* § 46.23, at 314–15. Moreover, the case law is well established that specific provisions of limitation control over related, more general provisions. *See generally, Pioneer Hi–Bred Int'l, Inc. v. J.E.M. Ag Supply, Inc.,* 200 F.3d 1374, 1376–77 (Fed.Cir. 2000), *aff'd,* 534 U.S. 124, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001) (general statute must give way to a specific one); *Dalton,* 98 F.3d at 1305 (if general and specific provisions are inconsistent, then the specific provision governs).

■ The court agrees with the court in *MAPCO* that the phrase "of three general types" in FAR 16.203–1, limits the permissible categories of EPA clauses. Based on basic principles of statutory construction and the text of FAR 16.203–1, the "Description" provision, and FAR 16.203–3, the "Limitations" provision, it is the court's view that the use of agency-prescribed EPA clauses must be restricted to types of EPA clauses that are based either on fluctuations in labor or material costs or on changes in the contractor's established prices that are reflective of industry-wide contingencies. *See* FAR 16.203–2. Accordingly, the court construes the FAR provisions as restrictive rather than illustrative.

■ The EPA clause in Gold Line's contract, Clause B19.33, is a market-based clause. The parties do not dispute that Clause B19.33 is not one of the "three general types" of EPA clauses described in FAR 16.203–1. *See* Def.'s Mot. at 14; Pl.'s Opp. at 13. Clause B19.33 is not based on a cost index. *See* FAR 16.203–1(c). Nor is Clause B19.33 based on actual labor or material costs, *see* FAR 16.203–1(b), or on Gold Line's established prices. *See* FAR 16.203–1(a). Clause B19.33 does not comply with the express terms of the FAR. Because the use of Clause B19.33 "is inconsistent with the FAR," defendant's use of the EPA clause was an unauthorized deviation under the FAR. *See* FAR 1.401(a).

Notwithstanding the detailed analysis of the meaning of the term "established prices" in FAR 16.203–1(a) set forth in the *MAPCO* decision, 27 Fed.Cl. at 409–411, defendant urges that Clause B19.33 satisfies the requirements of the FAR which authorize the adjustment of contract prices based upon changes in "published or otherwise established prices." Defendant's Response to Plaintiff's Comments Upon Oral Argument (Def.'s Comments) at 1–2 (quoting FAR 16.203–1(a)).

In support of its position, defendant relies on FAR 16.203–4(b), a provision authorizing a contracting officer to include an agency-prescribed clause for semi-standard supplies if the clause prescribed by FAR 52.216–3 (Economic Price Adjustment—Semistandard

Supplies) is inappropriate,[13] provided that certain conditions are satisfied. Def.'s Comments at 2 (quoting FAR 16.203–4(b)). The conditions that must be met are: (i) a fixed price contract is contemplated; (ii) the requirement is for semi-standard supplies for which prices can be reasonably related to the prices of nearly equivalent standard supplies that have an established catalog or market price, verified using the criteria in FAR 15.804–3; and (iii) the contracting officer has made the determination specified in FAR 16.203–3. Def.'s Comments at 2 (quoting FAR 16.203–4(b)).

Defendant points out that FAR 15.804–3(c)[14] separately defines the phrases "established catalog prices" and "established market prices." Def.'s Comments at 2. As defined under FAR 15.804–3(c)(1), "established catalog prices" are "prices (including discount prices) recorded in a catalog, price list, schedule, or other verifiable and established record that (A) are regularly maintained by the manufacturer or vendor; and (B) are published or otherwise available for customer inspection." *Id.* As defined under FAR 15.804–3(c)(2), "established market prices" are "*current* prices that (i) are established in the course of ordinary and usual trade be-

tween buyers and sellers free to bargain and (ii) can be substantiated by data from sources independent of the manufacturer or vendor." *Id.* (emphasis added).

Defendant relies on the Declaration of C. Alan Stevens, a consultant specializing in the energy industry, to support its contention that the JP–8 fuel purchased by the government is "very similar to [Jet–A] the commercial jet fuel the airlines use." Def.'s Reply at 11; Appendix to Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Defendant's Opposition to Plaintiff's Cross Motion for Partial Summary Judgment (Def.'s Reply App.) at 2. Defendant explains that because both fuels are 99.9 percent kerosene-based,[15] "an index that is appropriate to adjust the price of Jet–A [commercial grade jet fuel] would also be appropriate to adjust the price of JP–8 in a Government contract." Def.'s Reply App. at 2. Arguing that the PMM index, used to make price adjustments under the EPA clause in Gold Line's contract, correlated well with the published industry indices of OPIS and Platt's Oilgram,[16] *see* Def.'s App. at 4, defendant contends that the PMM index satisfies the requirements for "established mar-

**13.** FAR 52.216–3 sets forth the text of an EPA clause that may be used in a contract for semistandard supplies. The clause requires the contractor to warrant that the supplies identified as specific line items are "supplies for which it has an established price." FAR 52.216–3(a). The provision defines an "established price to be a price that (1) is an established catalog or market price for a commercial item sold in substantial quantities to the general public, and (2) is the net price after applying any standard trade discounts offered by the Contractor." *Id.* Here, Gold Line has provided no warrant that the supplied JP–8 fuel had an established price because, as plaintiff has argued, no commercial market exists for the military fuel. *See* Plaintiff's Reply to Defendant's Opposition to Plaintiff's Cross Motion for Partial Summary Judgment (Pl.'s Reply) at 6. Although defendant contends that JP–8 is very similar to the commercial fuel used by the airlines, *see* Def.'s Reply at 11, defendant has declined to argue that use of this FAR provision is appropriate in this case.

**14.** FAR 15.804–3(c) was eliminated by the FAR revisions which became effective on January 2, 1997. *See* Def.'s Comments at 2 n. 2.

**15.** Kerosene is one of the many petroleum products extracted from a barrel of crude oil. *See*

Def.'s Reply at 7; Transcript of August 13, 2002 Oral Argument (Oral Arg. Tr.) at 21–22. While both commercial grade jet fuel, jet-A, and government purchased jet fuel JP–8 are primarily kerosene-based, the two products are refined to different specifications and require different additive packages. Def.'s Reply at 7; Oral Arg. Tr. at 21. The additives affect various product properties, such as freeze point and flash point. *See* Oral Arg. Tr. at 21. There is absolutely no evidence that the markets are affected by the same or even remotely similar forces.

**16.** The petroleum industry has recognized three sources of published indices pertaining to the refined-products market include: PMM, OPIS, and Platt's Oilgram. *See Barrett Refining*, 42 Fed.Cl. at 131. Both OPIS and Platt's Oilgram are industry publications that report their own indices regarding petroleum product prices. *Id.* In charting the correlation between the PMM index and OPIS index, defendant's expert used numbers for the Gulf Coast and the East Coast. Def.'s Reply App. at 4. In charting the correlation between the PMM index and the Platt's numbers, defendant's expert used numbers for the Gulf Coast only. *Id.*

ket prices" under FAR 15.804–3(c)(2). Def.'s Comments at 3.

Challenging the *MAPCO* decision, defendant argues that "established market prices," as contemplated by FAR 15.804–3(c)(2), were not to be tied to the prices of a particular vendor or offeror. Def.'s Comments at 3. Rather, defendant asserts, the regulation "expressly recognized that established market prices ... would be prices charged by sellers and paid by buyers." *Id.* Defendant contends that "[b]ecause the prices [published by the PMM] are established by using the actual sales prices between a number of sellers and buyers, they satisfy the FAR 15.804–3 requirement that market prices be prices established in the ordinary course of business between buyers and sellers free to bargain." *Id.* at 4.

Defendant also disputes *MAPCO's* holding that the PMM prices are not "current" within the meaning of FAR 15.804–3(c). Def.'s Comments at 5. While defendant does not dispute that the industry did not use the PMM index due to its untimeliness, Def.'s Reply App. at 4 (stating "[t]hat industry did not use the PMM because of its *timing* does not render the index *inaccurate* for pricing purposes"), defendant argues here that the PMM prices satisfied the regulatory requirement for "current" prices under FAR 15.804–3(c)(2) because Clause B19.33 "insured that contract price adjustments would be based upon the prices in effect for the month in which the product was delivered."[17] Def.'s Comments at 5. Defendant asserts that Clause B19.33 "operated to insure that the prices are current for the price adjustment purpose for which they are used in the contract." *Id.*

Gold Line argues that the PMM does not meet the requirements for established catalog prices under FAR 15.804–3(c)(1). Plaintiff's Comments on the Oral Argument (Pl.'s Comments) at 2. In addition, Gold Line disputes the assertion that Clause B19.33 is a market-based EPA clause for the reason that the PMM index used in the adjustment formula does not reflect an "established market price." Pl.'s Opp. at 17 (citing *MAPCO*, 27 Fed.Cl. at 410). *See also* Pl.'s Comments at 2. Citing the *MAPCO* decision, 27 Fed.Cl. at 410, plaintiff argues that the PMM index does not reflect an established market price because it "is an amalgamation of the previous month's petroleum sales data" and it is "not determinative of any particular refiner's current prices" as contemplated by FAR 15.804–3(c)(2). Pl.'s Opp. at 17; Pl.'s Comments at 2.

Gold Line relies on the Declaration of Dennis J. McCormick, a consultant specializing in energy and energy-related industries, to support its position that neither the commercial refining nor aviation industries have adopted the PMM for pricing kerosene-based jet fuel or any other refined petroleum product and that only defendant uses the PMM to price jet fuel contracts. Pl.'s Opp. at 19; Appendix to Plaintiff's Opposition to Defendant's Motion for Summary Judgment and Cross Motion for Partial Summary Judgment (Pl.'s App.) at 112. Gold Line adds that, because the PMM reports sales that are at least three months old, the pricing index is not useful as a pricing mechanism in a commercial market where prices often change daily. Pl.'s Opp. at 19; Pl.'s App. at 112. Moreover, plaintiff argues, because the PMM publishes average prices covering broad geographic areas, the sales data does not necessarily correlate to the actual conditions in a refiner's geographic market nor does it contemplate common industry practices that affect prices.[18] Pl.'s Opp. at 19; Pl.'s App. at 115.

---

17. Defendant points to Clause B19.33, Part D, paragraph(a) which provided:
   [c]ontract prices for each month's deliveries will be based on the specified references listed by the ... [PMM] ... for the month dated during the month of delivery.... For example, the contract price for April deliveries will be based on the April data of the [PMM], which would usually be published sometime in mid-July.
   Def.'s App. at 6.

18. The common industry practices to which plaintiff refers include: (1) product exchanges or "in-kind swaps" that often have a cash component to adjust for market-related differentials in product location or product quality; *see* Pl.'s App. at 115, n. 4, (2) retroactive price rebates related to volume discounts; *see* Pl.'s App. at 115, and (3) prompt payment discounts. *See* Pl.'s App. at 115.

The court finds defendant's factual and legal arguments for recognizing the PMM index as an "established price" within the meaning of the relevant FAR provision unpersuasive. The court agrees with the *MAPCO* court's statutory interpretation of "established prices," a plain text interpretation informed by a careful analysis of the pertinent legislative history of the regulation.[19] As articulated in *MAPCO*:

[T]he meaning of "established prices" in FAR 16.203–1(a) is clarified by the "Limitations" provision, § 16.203–3, which specifically refers to "contractor's established prices." Because it is located in the same section, the language of 16.203–3 plainly gives meaning to the phrase "established prices" used in § 16.203–1(a).

. . . .

Other portions of the regulations also indicate that the phrase "established prices" refers to the contractor's established prices. The standard EPA clauses for "Adjustments based on established prices" authorized under § 16.203–4 are set out in FAR § 52.216–2 and § 52.216–3. These standard clauses base adjustments to contract price on fluctuations in the contractor's established prices.

. . . .

In these clauses, the terms ["]contractor's established price" and "established price" are used interchangeably.... Each standard EPA clause reflects the mandates of the § 16.203–3 "Limitations" provision.... While it is not necessary that the "agency-prescribed" clauses available to DFSC mirror precisely the verbiage in § 16.203–3,

"agency-prescribed" EPA clauses must reflect the concepts underlying that regulation.

*MAPCO*, 27 Fed.Cl. at 409–10. The court further observed that, as set forth in the relevant statutory provisions, an EPA clause may be used "to provide for contract price adjustment in the event of changes in the contractor's established prices," *see* FAR 16.203–3, and such price adjustments "should normally be restricted to industry-wide contingencies." *MAPCO*, 27 Fed.Cl. at 412 n. 8 (quoting FAR 16.203–2).

Defendant does not deny that the PMM index, the price adjustment mechanism underlying Clause B19.33, is not tied to Gold Line's established prices. *See* Def.' Mot. at 27; Def.'s Reply at 13. Rather, defendant argues, as a factual matter, that the PMM index operated "consistently with the objective" of the FAR to protect against changes in Gold Line's established prices. *See* Def.'s Mot. at 17. Defendant's arguments must fail, however, because the proper inquiry for the court is not whether Clause B19.33 operated consistently with the "objectives" of the FAR, but whether the clause complied with the requirements of the FAR. Seeing no salient distinction between the legal arguments addressed in *MAPCO* and advanced by defendant here, the court concludes that Clause B19.33 did not comply with of the FAR.

**E. Whether Gold Line Waived Its Claim**

■ Relying on the Federal Circuit's decision in *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed.Cir.1997), defendant argues

---

19. The court in *MAPCO* examined the regulatory forerunners to FAR Subpart 16.2, noting that the FAR resulted from a 1978 initiative to unify and simplify the federal procurement system, which had been governed by two systems of regulations, specifically, the Defense Acquisition Regulations (DAR) and the Armed Services Procurement Regulations(ASPR). *MAPCO*, 27 Fed.Cl. at 409. As emphasized by the Office of Federal Procurement Policy in a published final draft of the FAR, "The intent [was] not to create new policy." *Id.* (quoting "Types of Contracts," 46 Fed.Reg. 42,-303 (1981)). The court in *MAPCO* observed that FAR Subpart 16.2 is "largely a reproduction of DAR § 3.404, except that the original order of the DAR sections that now comprise § 16.203 were altered in promulgating the FAR." *Id.* The

first provision in the DAR "expressly referred to the need to make any adjustments because of fluctuations in the contractor's established prices." *Id.* The subsequent DAR provision listed the three allowable types of EPA clauses. *Id.* Applying basic principles of statutory interpretation, the court in *MAPCO* reasons that "the word 'contractor's' [in the first DAR provision] could ... be omitted from the subsequent term 'Adjustments based on established prices,' and ... still convey [the] same meaning." *Id.* The court concluded that, based on the "limited mandate of the FAR committee," the reversal in order of the regulatory provisions from the DAR to the FAR did not alter the meaning of the phrase "established prices" to exclude the reference to a contractor's established prices. *Id.* at 410.

that plaintiff has waived its right to challenge the EPA clause by failing to make a timely objection to the use of the EPA clause prior to the execution of the contract. Def.' Mot. at 28–35; Def.'s Reply at 14–20. Plaintiff denies any waiver. Pl.'s Opp. at 24–27; Pl.'s Reply at 12–15.

The *Whittaker* case involved a fixed price plus incentive fee contract between a contractor and the Air Force to build a simulator of certain Soviet long range radar. *Whittaker*, 124 F.3d at 1444. Def.'s Mot. at 29. The contract consisted of a Phase I research and development effort, with an option to acquire two radar systems in Phase II. *Id.* During the performance of the contract, the contractor was acquired by another contractor (the successor contractor). *Id.* at 1445. After fully performing the contract, the successor contractor sought an equitable adjustment for the additional time and money spent to complete the contract. *Id.* at 1444. Among the arguments advanced by the successor contractor was an allegation that the contract was *void ab initio* because the contract contained a regulatory violation, specifically, an option clause that violated DAR § 1–1502.[20] The Federal Circuit held that "[t]he doctrine of waiver precludes a contractor from challenging the validity of a contract ... where [the contractor] fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." *Id.* at 1446.

Gold Line argues that the *Whittaker* decision is distinguishable. Pl.'s Opp. at 26. The court agrees. The alleged breach of procurement regulations in *Whittaker* occurred after the contract award, while the

breach in this case was "inherent in" the award. *Id.* (quoting *Applied Devices Corp. v. United States,* 219 Ct.Cl. 109, 591 F.2d 635, 640–41 (1979)).[21] Plaintiff argues that, under the case law, "where a contractor has challenged the legality of a price adjustment clause on the ground that it violated the FAR, the contractor has been afforded the right to seek a remedy." Pl.'s Reply at 12–13 (citing, among other cases, *Barrett Refining Corp. v. United States,* 242 F.3d at 1060 n. 2) (A determination "that only the price escalation term was unenforceable and invalid, and that the entire contract was not invalid, is consistent with our case law."); *Beta Sys., Inc. v. United States,* 838 F.2d at 1185 ("The risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the contractor.").

In *American Tel. & Tel. Co. v. United States,* 177 F.3d 1368, 1376 (Fed.Cir.1999), the Federal Circuit observed, "When a contract or a provision thereof is in violation of law but has been fully performed, the courts have variously sustained the contract, reformed it to correct the illegal term, or allowed recovery under an implied contract theory; the courts have not, however, simply declared the contract void ab initio." On remand, the Court of Federal Claims noted that "the touchstone for reformation was the transgression of a mandatory regulation." *American Tel. & Tel. Co. v. United States,* 48 Fed.Cl. 156, 159 (2000), *aff'd on other grounds,* (2002). The Court of Federal Claims added that the case law "support[s] the remedy of reformation" when a contract includes "price terms that disregard the dictates of a mandatory regulation or statute." *Id.*

---

**20.** Defense Acquisition Regulation (DAR) § 1–1502 prohibited the inclusion of option clauses in solicitations if such inclusion requires a contractor "to incur undue risks (e.g., the price or availability of necessary materials or labor is not reasonably foreseeable)." DAR § 1–1502(b)(ii) (1983). This prohibition is "[b]ecause options require offerors to guarantee prices for definite periods of time with no assurance that the options will be exercised, their improper inclusion could result in prices which are unfair to either the Government or the contractor." DAR § 1–1502(a). The DAR was superseded in 1984 by the Federal Acquisition Regulation (FAR). *Lockheed Corp. v. Widnall,* 113 F.3d 1225, 1226 n. 3 (Fed. Cir.1997).

**21.** In *Applied Devices,* the Court of Claims stated:

In cases of breach by the government subsequent to contract award, the contractor can easily lose its remedies by failure to protest once the breach is known to it..., but such cases must be distinguished from those in which a breach of law is inherent in the very writing of the contract involved. In such cases reformation is available despite the initial adherence of the contractor to the contract provision now shown to be illegal.

*Applied Devices Corp.,* 591 F.2d at 640–41 (citation omitted).

It is the view of the court that implicit in the decisions permitting reformation of a fully performed contract containing an illegal term or provision is permission for the contractor to challenge that illegal term. Accordingly, having determined that the EPA clause in Gold Line's contract was unauthorized, the court finds no waiver of Gold Line's right to challenge the inclusion of that contract term under a theory of either quantum valebant or reformation for mutual mistake. *See Gold Line Refining*, 43 Fed.Cl. at 296–97.

Because this court may execute equitable powers as an incident to our general jurisdiction, for example, by reforming a contract and enforcing it as reformed in "an action at law," *Carney v. United States*, 199 Ct.Cl. 160, 163–64, 462 F.2d 1142, 1145 (Ct.Cl.1972), the court turns now to consider how to reform the EPA clause of Gold Line's contract to conform more closely to the requirements of the FAR and to give effect to the expressed intent of the parties in the contract. *See American Tel. & Tel. Co.*, 177 F.3d at 1376; *American Tel. & Tel. Co.*, 48 Fed.Cl. at 159.

### F. Harm

Defendant asserts that, even if the EPA clause contained in Gold Line's contract is unauthorized, plaintiff cannot prevail on its claim because plaintiff was not harmed by the operation of the EPA clause in its contract. Def.'s Mot. at 22–28. Defendant states that "[m]ere transgression of the FAR is not enough." *Id.* at 22.

Whether defendant's claim of no harm is correct depends on what methodology is substituted for Clause B19.33 to measure plaintiff's entitlement. Defendant argues that plaintiff has erroneously calculated its alleged damages both because Clause B19.33 "operated well" to achieve the purposes of the FAR, Def.'s Mot. at 18; Def.'s Mot.App. at 68, an argument that the court has found unpersuasive, and because plaintiff did not use February 1993 as its base month. Def.'s

Reply at 3, 20–22. Defendant argues that "the starting point must be the contractually mandated February 1993 base month and Gold Line's corresponding bid price." Def.'s Reply at 20. Defendant also challenges using the cost of crude oil to determine the material costs for jet fuel because "[a] barrel of crude contains, on average, only 5 to 15 percent kerosene ... [and] only part of the cost of a barrel of crude oil is a material cost of ... jet fuel." Def.'s Reply at 7–8. Notwithstanding the foregoing, defendant acknowledges that "[c]rude oil is the major material cost in the refining process .... [potentially bearing] a profound influence upon end product prices." Def.'s Mot. at 17.

While defendant recognizes that, by using a market-based EPA clause rather than a cost-based clause in Gold Line's contract, "some differences in effect [were] to be expected," defendant insists that "the market-based EPA provision did not deprive Gold Line of any benefit that the FAR would have given it." Def.'s Mot. at 26. Defendant then admits that the foregoing is not quite true, acknowledging that, even under defendant's view of the proper base month, Gold Line would have received an additional payment of nearly $74,000 if the EPA provision in Gold Line's contract had been based on Gold Line's crude oil costs. Def.'s Mot. at 18; Def.'s App. at 68; Oral Arg. Tr. at 7–8. Defendant seeks to minimize the impact of this admission by noting that Gold Line would have received only an additional 0.3 percent (.003) more in payments had Gold Line's crude oil costs been used to adjust the prices it received for JP–8. *See* Def.'s Mot. at 18; Def.'s Mot.App. at 68. Defendant suggests that the "0.3 percent difference relative to JP–8 indicates that the EPA clause operated well in protecting both Gold Line and the Government against fluctuations in crude oil costs." [22] Def.'s Mot. at 18; Def.'s Mot. App. at 68.

Plaintiff contends that crude oil costs are an appropriate basis for adjusting jet fuel contract prices because crude is the primary raw material used in the production of JP–8

---

22. Although Gold Line's claim is limited to a claim for underpayments of its JP–8 deliveries only, *see* Pl.'s Reply at 11, defendant urges that the court also consider the impact of plaintiff's JP–4 sales in calculating damages. Def.'s Reply

at 22. Defendant contends that "[c]onsideration of JP–4 demonstrates that when the contract as a whole is considered, Gold Line was not harmed, but actually benefitted from the operation of Clause B19.33." *Id.* However, as plaintiff points

military jet fuel, and because there is "an inherent relationship between the cost of crude oil and the price of military jet fuel." Pl.'s Reply at 7. Plaintiff also argues that the court should employ crude oil costs for the month of June 1993 because that was the month in which Gold Line prepared and submitted its best and final offer ("BAFO"), and because the use of February 1993 as a base would have the effect of legitimating the government's use of a clause unauthorized by the FAR. *See* Pl.'s Opp. at 21; Pl.'s Reply at 10. Clause B19.33, the court has found, violates FAR requirements, including the requirement to use the contractor's actual costs or prices and the requirement to use current costs or prices.

There is no dispute that the contracting officer communicated to the bidders by facsimile transmission dated June 18, 1993 that February 1993 was the base month to be used by the bidders in preparing their bid prices for submission with their BAFOs. *See* Def.'s Reply App. at 29–34. Plaintiff is entitled, however, to have its price adjusted in a manner consistent with law. Another court has noted that there may be some "irony" in resorting to the price determined under Clause B19.33 as the base contract price. *Barrett Refining Corp.*, 42 Fed.Cl. at 138 n. 24 ("The irony of using an [illegal] EPA clause [to determine the base contract price] is not lost on the court."). The court must interpret the contract to reflect the intention of the parties and, as much as possible, leave the parties' bargain intact in the light of those intentions. *See Barrett Refining Corp.*, 242 F.3d at 1061; *Gould, Inc.*, 935 F.2d at 1274; *Beta Sys., Inc.*, 838 F.2d at 1185.

In this case the court has already determined that the parties could only have intended to use an EPA clause which would function consistently with the FAR. *Gold Line Refining*, 43 Fed.Cl. at 296 n. 8, 296–97. In this opinion, the court finds that Clause B19.33 did not function in accordance with the FAR. The court finds that plaintiff is entitled to quantum valebant relief or, in the alternative, reformation of the EPA clause, the illegal contract term, in either case tai-

lored to further, to the extent possible, the mutual intent of the parties to adjust prices in accordance with the FAR. *See American Tel. & Tel. Co. v. United States,* 307 F.3d 1374, 1381 (Fed.Cir.2002); *American Tel. & Tel. Co.,* 48 Fed.Cl. at 159. The court will consider, at the trial on damages, whether the substitution of June prices will further the intent of the parties in this regard.

### III. Conclusion

For the foregoing reasons, defendant's Motion for Summary Judgment is DENIED. Plaintiff's cross-motion for summary judgment is GRANTED with respect to the unenforceability of Clause B19.33 in Gold Line's contract and is otherwise DENIED. On or before November 12, 2002, the parties shall submit a joint proposal or, if they cannot agree, separate proposals, for further proceedings in this matter, including a pretrial schedule as contemplated by Appendix A to the Rules of the Court of Federal Claims, to address the determination of damages.

IT IS SO ORDERED.

---

out and defendant does not dispute, the contracting officer's decision does not address Gold Line's JP–4 deliveries. *See* Pl.'s Reply at 11;

Oral Arg. Tr. at 26. Nor has defendant brought a counterclaim or claim of setoff.