**NORTH AMERICAN CONSTRUCTION CORP., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 97–831C.**

United States Court of Federal Claims.

April 1, 2003.

Thomas E. Hill, Dallas, Texas, attorney of record for the plaintiff.

Karla J. De Steuben and Timothy P. McIlmail, Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr., David M. Cohen, Director and James M. Kinsella, Deputy Director for the defendant.

## *OPINION*

MEROW, Senior Judge.

This matter is before the court upon defendant's motion for summary judgment pursuant to Rule 56 of the Rules of the Court of Federal Claims. Plaintiff, a contractor, entered into an agreement with the government to perform renovation work upon government property located in Sacramento, California. Pursuant to the terms of this contract, the standard Changes clause, found in Federal Acquisition Regulation § 52.243–4, is supplemented by General Service Acquisition Regulation § 552.243–71, which provides authority and direction to the Contracting Officer with respect to payment of three specific elements of an equitable adjustment: commission, overhead and profit. Plaintiff requested that a 20% commission "mark-up" be applied to the subcontractor's costs arising from change orders on this project, however, the government paid only 10%, asserting that pursuant to the GSAR provision, the amount of plaintiff's commission was limited to 10% of the subcontractor's change order costs. The crux of the parties' dispute is whether the amount of that commission was properly determined. For the reasons stated below it is concluded that defendant's motion for summary judgment is granted.

## BACKGROUND

### *Facts and Procedural History*

The facts of this matter are undisputed unless otherwise noted. On or about June 30, 1992, plaintiff, North American Construction Corp. ("NACC") and the General Services Administration ("GSA") entered into Contract No. GS–09P–92–KTC–0040 ("the contract"). Pursuant to that agreement, NACC was to perform renovation work on the Federal Building located at 801 "I" Street, Sacramento, California, including seismic and fire/life safety upgrades, asbestos abatement, and improvements to the mechanical and electrical systems ("Sacramento Project").

The contract included the standard Changes clause set forth at Federal Acquisition Regulation ("FAR") § 52.243–4.[1] In contracts such as this, in which the agency entering into the contract is GSA, that clause is supplemented by GSAR § 552.243–71, also known as the GSAR Equitable Adjustment clause, which provides, in relevant part:

---

1. The 1991 version of the Code of Federal Regulations (setting forth the Federal Acquisition Regulations and the General Service Acquisition Regulations) is relied upon unless otherwise noted.

EQUITABLE ADJUSTMENTS (APR 1984)

(a) The provisions of the "Changes" clause prescribed by FAR [Federal Acquisition Regulation] § 52.243–4 are supplemented as follows:

* * *

*Overhead, Profit and Commissions*

(2) The allowable overhead shall be determined in accordance with the contract cost principles and procedures in Part 31 of the ... FAR (48 CFR part 31) in effect on the date of this contract. The percentages for profit and commission shall be negotiated and may vary according to the nature, extent and complexity of the work involved, but in no case shall exceed the following unless the contractor demonstrates entitlement to a higher percentage:

|  | Overhead | Profit | Commission (percent) |
|---|---|---|---|
| To Contractor on work performed by other than his own forces ............... | ............ | ..... | 10 |
| To first tier subcontractor on work performed by his subcontractors ...... | ............ | ..... | 10 |
| To Contractor and/or the subcontractors for that portion of the work performed with their respective forces. | To be Negotiated | 10 | .......... |

* * *

The Contractor shall not be allowed a commission on the commission received by a first tier subcontractor. Equitable adjustments for deleted work shall include credits for overhead, profit and commission. On proposals covering both increases and decreases in the amount of the contract, the application of overhead and profit shall be on the net change in direct costs for the Contractor or subcontractor performing the work.

* * *

48 C.F.R. § 552.243–71.[2]

During the course of performance of the contract, NACC, through its subcontractors, performed work pursuant to government issued change orders. In reliance upon the GSA Equitable Adjustment clause, GSA paid NACC a 10% commission on the subcontractor's change order costs.

At some point prior to November 17, 1992, NACC produced a copy of a March 31, 1992 letter from Mr. Michael Rutter ("Rutter letter"), a GSA employee, which was addressed to the Senior Project Manager of NACC, Mr. Henry Warden, concerning negotiations regarding an unrelated renovation project NACC had worked on in Spokane, Washington ("Spokane Project"). With regard to the negotiations relative to the Spokane Project, GSA "agreed to apply a 20% factor to subcontractor costs for subcontractor commission; prime contractor change order development and coordination costs; and prime contractor [General and Administrative ('] G & A[')] expenses allocated with subcontracted work." Pl.'s Ex. 1. NACC submitted the Rutter letter to a company called Wagner–Hohns–Inglis–Inc.[3] for consideration with regard to NACC's assertions that a similar commission should also be provided by the government in conjunction with the Sacramento Project.

By letter dated November 17, 1992, Mr. Jon M. Porterfield, P.E., Construction Manager for Wagner–Hohns–Inglis–Inc., Construction Consultants, acknowledged receipt of a copy of the Rutter letter. Mr. Porterfield also noted that in the Rutter letter, GSA had expressly limited its negotiated arrangement, to apply a 20% factor to subcontractor costs, by making that agreement applicable only to the Spokane Project. Pl.'s

---

**2.** In order to avoid confusion with regard to the two regulations at issue in this matter, the full citation in the Code of Federal Regulations shall be replaced with a reference to either the GSAR or the FAR (*e.g.* 48 C.F.R. § 552.243–71 shall be referred to as GSAR § 552.243–71, and 48 C.F.R. § 52.243–4 shall be referred to as FAR 52.243–4).

**3.** Although the letterhead, upon which the representative from Wagner–Hohns–Inglis–Inc. responded to Mr. Warden's letter, identifies the company as a "Construction Consultant" firm, the role of that entity in this matter has not been explained in the parties' submissions.

App. at 13. Mr. Porterfield also noted that to the extent that NACC requested the application of a 20% factor to subcontractor costs for the Sacramento Project, that figure represented "double the 10% commission limit on subcontractor costs permitted under . . . [the Sacramento Project] contract." Pl.'s App. at 13. Mr. Porterfield opined that pursuant to the GSAR Equitable Adjustment clause, the commission on subcontractor work was not to exceed 10%, except in instances in which "the contractor demonstrates entitlement to a higher percentage." Pl.'s App. at 13; GSAR § 552.243–71(a)(2). Accordingly, Mr. Porterfield requested that NACC "submit supporting documentation demonstrating . . . entitlement to a 20% factor." Pl.'s App. at 13.

By letter dated November 19, 1992, Mr. Warden explained to Mr. Porterfield that NACC believed itself to be entitled to "recover G & A overhead at the rate of 11.83% [4] . . . [as well as] a profit of no less than 10% . . . [in other words, by adding 11.83% (for the G & A overhead rate) to 10% (to account for the profit), and therefore asserted entitlement to a commission of] 21.83%. . . ." Pl.'s App. at 16. Mr. Warden supported this position by asserting that:

A definition of commission is not found in the FAR, but it can logically be surmised to mean payment of an overhead and profit. This would be consistent with the basic theory of an "Equitable Adjustment" which is simply a corrective measure utilized to keep the contractor whole when the [g]overnment modifies a contract.

Costs associated with a change may be characterized as direct costs and indirect costs. To make a contractor whole, he must be reimbursed for indirect as well as direct costs. Subcontractor costs are a direct cost. Indirect costs for NACC are a General and Administrative (G & A) expense. Same is strictly calculated under the provisions of FAR 31 and results in a 12.09% rate that is applied to direct costs.

This rate does not differentiate between the source of income, i.e., prime contractor or subcontractor work. Rather, it is developed based on generally accepted accounting principles which are consistently applied to all "costs."

Accordingly, to be made whole under the theory of an equitable adjustment, NACC should realize its allowable overhead on added work, irrespective of the source of that cost element. Same should result in the payment of 12.09% on each change order dollar. The attached G & A statement [5] is calculated in accordance with the provisions of the FAR, Section 31, and demonstrates the allowable nature of the requested rate.

With respect to profit, there is typically no question that it is a normal part of an equitable adjustment. The various Boards of Contract Appeals often find that a 10% profit rate is an industry norm. It should be noted that this is a very old rehabilitation project of an occupied facility that contains asbestos-contaminated materials, lead paint, and many other unknown factors. Arguments could be rendered that a greater than 10% rate would be appropriate for the attendant risk and exposure.

NACC has recently conducted discussions with your Office of Audits relative to certain minor elements of the allowable overhead pool. Pursuant to same, an allowable General and Administrative rate of 11.83% was mutually agreed upon between NACC . . . and GSA San Francisco . . . .

Therefore, to be made whole, as prescribed under the theory of Equitable Adjustment, NACC should recover G & A overhead at the rate of 11.83% and a profit of no less than 10%, or 21.83% as commission.

Pl.'s App. at 15–16.

On or about August 14, 1996, NACC submitted a claim to the Contracting Officer ("CO") seeking payment of $334,555.00 for the unpaid commission requested, above the

---

4. It appears that this estimate may no longer be accurate. In its brief in opposition, plaintiff now asserts that the appropriate G & A rate in this case is 8.42%. Pl.'s Opp'n at 11, n. 3. NACC contends that this rate has been "audited and approved by DCAA [the Defense Contract Audit Agency] and is therefore in accordance with FAR part 31." *Id.*

5. The referenced G & A statement has not been provided to the court.

10% commission previously paid by GSA, upon NACC's subcontractor's costs arising from government directed change orders relative to the Sacramento Project. NACC asserted in its claim letter that it sought "an auditable overhead/profit rate or commission" of 19.96%. Pl.'s App. at 2. Attached to its claim letter, in which NACC requested a final decision, was a letter dated July 2, 1996, in which Ms. L. Darlene Starkey, Vice President and Chief Financial Officer of NACC,[6] stated, in relevant part:

> Due to its size and complexity, the ... [Sacramento] project was bid with a 25% increase for G & A and profit. The updated budget at the completion of the project buy-out reduced this rate to 19.96%. Since the work performed in the numerous contract modifications was essentially the same in type and complexity of the work in the basic contract, NACC respectfully requests that it be reimbursed the combined G & A and profit rate of 19.96% for all change order work performed on this project.

Pl.'s App. at 4, 19.

On December 6, 1996, the CO issued her final decision and denied NACC's request for a 19.96% commission. The CO explained that she found NACC's argument, that the commission rate referred to in the GSAR Equitable Adjustment clause should be determined by combining NACC's expected level of profit with its overhead, to be unsupportable. Rather, the CO opined that the term "commission" should be construed to

mean the "sum or percentage allowed to an agent for his services." Pl.'s Ex. at 6. To reach this conclusion, the CO relied upon the definition of the term "commission" found in the American College Dictionary, as well as a decision, issued on May 1, 1978, by the General Services Board of Contract Appeals which the CO construed to be analogous to the situation presented by NACC.[7] Pl.'s Ex. at 6. To the extent that NACC was asserting that it had been denied the right to "demonstrate its entitlement to a higher amount" of commission, the CO determined that NACC "ha[d] attempted to do so but ha[d] ... failed to demonstrate any entitlement." Pl.'s App. at 6. Finally, the CO noted that in each of the modifications issued to NACC, a 10% commission was paid for NACC's services in handling the modification. In this respect, the CO also pointed out that many of the "indirect" types of costs alleged by NACC to compose a portion of the "overhead" costs were in fact included on the modifications as direct costs.

On December 4, 1997, NACC filed a complaint in this court challenging the CO's final decision.[8] Specifically, NACC requests this court to find it has a valid claim in the amount of $334,555.00, and that plaintiff is entitled to interest, pursuant to the CDA, from the date defendant received the claim until the date the claim is paid. On or about March 20, 1998, the government filed its answer in which it denied the allegations of the complaint.

---

6. This correspondence is an unusual addition to the request for a final decision in that it is not addressed to anyone in particular but rather bears the greeting "To Whom it May Concern." Pl.'s App. at 4. It is unclear why this correspondence was neither addressed to the CO nor made part of the body of the letter in which NACC requested a Final Decision. Ms. Starkey was clearly available at the time the request for a final decision was submitted as she signed the certification statement attesting to the contractor's good faith with respect to this claim. Pl.'s App. at 5.

7. The CO cited *Pyramid Construction Co.*, 1978 WL 2034, 78-1 B.C.A. ¶ 13,215 (May 1, 1978). In *Pyramid*, the Board concluded that contractors are limited to 10% overhead and 10% profit *for work performed by its own forces* and 10% commission *for work performed by forces other*

than its own. It is considered that *Pyramid Construction Corp.*, is not persuasive authority upon this issue because in that case the GSA Board of Contract Appeals relied upon an earlier version of the Equitable Adjustment clause which contained additional language, not present in the current wording of the GSAR Equitable Adjustment clause, which was relevant to that decision.

8. Pursuant to Rule 77(f) of the Rules of the Court of Federal Claims ("RCFC") (1992), in effect at the time the complaint was filed, NACC also filed a notice of a related case. That case involved a claim for damages to property alleged to have been caused by a flood at the Federal Building which was the subject of the Sacramento Project. That case, filed on April 10, 1996 was assigned docket number 96-187C and was dismissed by Order dated October 18, 2000.

NACC filed its pretrial submission on June 8, 1998. Subsequently, the government filed this motion for summary judgment upon each allegation raised in NACC's complaint.[9]

## DISCUSSION

### Jurisdiction

The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)[10], and the Contract Disputes Act, 41 U.S.C. § 609(a).

### Standard of Review

Summary judgment is appropriate upon a showing that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1231 (Fed.Cir.1997). Material facts are those which affect the outcome of the case. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. A dispute over a material fact is genuine if, based on the evidence presented, a reasonable fact-finder could find for the non-movant. *Id.* at 248, 106 S.Ct. 2505.

In its review of a motion for summary judgment, the Court must view the evidence and any disputed factual issues in the light most favorable to the party opposing the motion. *Id.* at 255, 106 S.Ct. 2505 ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Resolution of disputes pursuant to summary judgment is considered appropriate when "the pleadings, the depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (noting that a movant for summary judgment may prevail upon a showing "that there is an absence of evidence to support the nonmoving party's case"). The non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

Contract interpretation is a question of law which is properly resolved on summary judgment. *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed.Cir.2002); *Olympus Corp. v. United States*, 98 F.3d 1314, 1316 (Fed.Cir.1996); *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir.1996); *Airplane Sales Intern. Corp. v. United States*, 54 Fed.Cl. 418, 421 (2002). Similarly, the interpretation of regulations which are incorporated into government contracts is a question of law appropriate for resolution by the court. *Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1369 (Fed.Cir.2003); *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed.Cir.1986).

### FAR § 52.243–4

There is no dispute regarding the interpretation of the standard Changes clause set forth in the FAR. That clause authorizes the CO to pay additional funds to a contractor, in the form of an equitable adjustment, "if any change under this clause causes an increase or decrease in the [c]ontractor's cost of, ... the performance of any part of the work under this contract." *See* FAR 52.243–4(d). It is also well established, and undisputed in this matter, that the spirit and purpose of an

---

9. The government has not yet filed its pre-trial submissions, and requests that, in the event the instant motion is resolved against the United States, it be permitted 90 days within which to do so.

10. The 2000 version of the United States Code is relied upon unless otherwise noted.

equitable adjustment is to benefit the contractor and make it whole for changes ordered by the government. *See e.g., Bruce Constr. Corp. v. United States,* 163 Ct.Cl. 97, 100, 324 F.2d 516, 518 (1963) ("[e]quitable adjustments ... are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract"). Generally, this provision is the sole contractual clause authorizing additional payments in the event of changes to the contract. Moreover, as set forth in the guidelines regarding the applicable cost principles, in the context of fixed price contracts, parties negotiating an equitable adjustment need not negotiate each element of cost in order to arrive at the final cost. FAR § 31.102. Rather, the objective is to "negotiate prices that are fair and reasonable, cost and other factors considered." *Id.*

The FAR does not define each of the factors that might be included in an equitable adjustment. However, the cases which have evaluated equitable adjustments pursuant to the Changes clause of the FAR have identified the various elements of the final price agreed upon as including costs resulting from the change plus an allowance for profit and other administrative costs, including overhead. *See United States v. Callahan Walker Constr. Co.,* 317 U.S. 56, 61, 63 S.Ct. 113, 87 L.Ed. 49 (1942) ("An 'equitable adjustment' ... involved merely the ascertainment of the cost of [additional work] ... and the addition to that cost of a reasonable and customary allowance for profit"); *Rumsfeld v. Applied Cos., Inc.,* 318 F.3d 1317, 1329 (Fed.Cir.2002) (noting that CO had stated that "[a]n equitable adjustment compensates for changes by paying a contractor its increased costs resulting from the change, plus an allowance for profit on that cost"); *Earth Burners, Inc. v. United States,* 43 Fed.Cl. 481, 482, n. 1 (1999) ("[t]he proper measure of an equitable adjustment is reasonable costs, including reasonable profit for the work performed"); *Derek & Dana Contracting, Inc. v. United States,* 7 Cl.Ct. 627, 639 (1985) ("profit and overhead are recoverable under an equitable adjustment"); *Salem Eng'g and Constr. Corp. v. United States,* 2 Cl.Ct. 803, 809 (1983) ("[i]n appropriate circumstances ... [an equitable adjustment] includes profit and

overhead"); *Bennett v. United States,* 178 Ct.Cl. 61, 70, 371 F.2d 859, 864 (1967) (allowing overhead and profit as part of equitable adjustment).

### GSAR § 552.243–71

However, in contracts with GSA, Congress has authorized the promulgation of the GSAR. GSAR § 501.102 ("The ... GSAR is issued and maintained by the Associate Administrator for Acquisition Policy under the authority of the Federal Property and Administrative Services Act of 1949, as amended"). Unlike the Changes clause set forth in the FAR, the GSAR Equitable Adjustment clause expressly directs the CO to divide an equitable adjustment into three distinct components, that is, commission, profit and overhead. GSAR § 552.243–71(a)(2). Moreover, the GSAR directs the CO to allocate payment for changes among the prime contractor and the subcontractors according to which entity actually performs the work. *Id.* If the contractor or subcontractor performs the work itself, it is entitled to receive overhead and profit. *Id.* The GSAR Equitable Adjustment clause expressly provides payment of a commission, but not profit or overhead, to a contractor or subcontractor for work performed by another entity. *Id.*

### The Parties Contentions

No genuine issues of material fact exist with regard to the performance of the changed work at the Sacramento Project. NACC's subcontractor performed the work in question. Accordingly, the parties agree that NACC is the contractor in this matter and therefore is entitled to a commission pursuant to the GSAR Equitable Adjustment clause. The parties also agree that the amount of that commission is limited to 10% of the subcontractor costs "unless the contractor demonstrates entitlement to a higher percentage." GSAR § 552.243–71(a)(2). In the absence of a statutory or regulatory definition of the component elements of a commission, the crux of the parties' dispute is whether the contractor's commission, undisputably a negotiable item, may be upwardly adjusted based upon the factors NACC has presented.

The government contends that, in its view, NACC would be entitled to a commission which would exceed the 10% rate set forth in the GSAR Equitable Adjustment clause if it could show that "the nature, extent, and complexity of the work involved" merited such an increase. GSAR 552.243–71(a)(2). However, the government asserts, pursuant to its reading of the regulation, commission is an item separate and apart from profit or overhead, and further avers that the regulation states that overhead and profit are only paid to a contractor or subcontractor which actually performs the work. Therefore, because NACC's request for an upward adjustment of the 10% commission rate to 20% is solely based upon the sum of NACC's overhead rate and expected profit, such an adjustment would be inappropriate pursuant to the GSAR Equitable Adjustment clause.

NACC opposes the government's interpretation, arguing that because the GSAR Equitable Adjustment clause does not set forth the precise factors to be used in determining whether a contractor has shown entitlement to profit or commission mark-ups in excess of 10%, the principles set forth in the FAR with respect to equitable adjustments in conjunction with the Changes clause, should be followed to fully compensate a prime contractor for change order work by subcontractors. In this regard, plaintiff asserts that the term commission, which, it concludes, is not defined in the regulatory language, should be interpreted as a combination of profit and other administrative expenses, including overhead. In the alternative, notwithstanding defendant's assertion to the contrary, NACC argues that it has presented sufficient evidence regarding the nature, extent and complexity of the work to warrant the increased commission payment it requests.

### Analysis of GSAR § 552.243–71

■ The issue of how GSAR § 552.243–71 should be applied is one of first impression in this court, although the issue does appear to have been addressed, in part by the Boards of Contract Appeals. A decision by one of the Boards of Contract Appeals is not binding on this court. *Inter–Coastal Xpress, Inc. v. United States,* 49 Fed.Cl. 531, 538 (2001),

*aff'd,* 296 F.3d 1357 (Fed.Cir.2002); *Mega Constr. Co. v. United States,* 29 Fed.Cl. 396, 467 (1993). However, in the absence of precedential authority upon the issue before the court it is considered that the Boards' determinations may be viewed as persuasive authority. *See Al Johnson Constr. Co. v. United States,* 854 F.2d 467, 471 (Fed.Cir.1988) (attaching value to Board's legal conclusions due to its expertise in analysis of contract conditions).

### i.

In support of its argument that the general principles for determining an equitable adjustment pursuant to the FAR should apply and that the contractor's overhead and profit should be reflected in the calculation of the contractor's commission, NACC relies upon the GSA Board of Contract Appeal's decision in *Capital Electric Co.,* GSBCA No. 5316, GSBCA No. 5317, 83–2 BCA ¶ 16,548, 1983 WL 7572 (Feb. 13, 1983), *aff'd in part, reversed in part on other grounds and remanded by,* 729 F.2d 743 (Fed.Cir.1984), for the proposition that profit is an element of commission. NACC's reliance is misplaced. In *Capital Electric Co.,* the Board expressly stated that it was not applying the Equitable Adjustment clause in order to determine the issues in that case. Moreover, the Board noted that "[p]rofit is nothing more, and nothing less, than the contractor's *reward* for performing the contract work." *Id.* (emphasis added). Accordingly, since it is undisputed that NACC did not perform the contract work itself, there is little basis for asserting that it should be allowed to claim a reward, as part of the commission, for work performed. Pursuant to the terms of the regulation, that profit clearly belongs to the entity which actually performed the work. GSAR § 552.243–71(2).

NACC's reliance upon *Regan/Nager Constr. Co.,* GSBCA No. 1070, 85–1 BCA ¶ 17,778, 1984 WL 13847 (Dec. 13, 1984), is similarly misplaced as the contract in that case was between the contractor and the United States Postal Service, and not GSA. Although the contract in *Regan/Nager Constr. Co.,* purportedly contained an Equitable Adjustment clause, the decision does

not provide any guidance with regard to the wording of the GSAR Equitable Adjustment clause. Moreover, the Board did not construe that clause in conjunction with the Changes clause. Accordingly, there is no basis for finding the Board's determinations, in *Regan/Nager Constr. Co.*, to be persuasive authority with regard to the interpretation of NACC's contract.

▉ Contract interpretation begins with the plain language of the contract. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991). Moreover, it is a well established tenet of contract interpretation that if a statute, or regulation, provides that a thing shall be done in a certain way, there is a rebuttable presumption under the rules of statutory construction that there is an implied prohibition against doing that thing in another way. *Gold Line Refining, Ltd. v. United States*, 54 Fed. Cl. 285, 292 (2002) *(citing* 2A Singer, *Statutory Construction* § 46.23, at 314–15). In sum, "specific provisions of limitation control over related, more general provisions." [11] *Gold Line Refining*, 54 Fed.Cl. at 292 *(citing Pioneer Hi–Bred Int'l Inc. v. J.E.M. Ag Supply, Inc.*, 200 F.3d 1374, 1376–77 (Fed.Cir.2000), *aff'd*, 534 U.S. 124, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001)); *see also Dalton v. Cessna Aircraft Co.* 98 F.3d 1298, 1305 (Fed.Cir.1996) *quoting Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed.Cir.1992).

▉ In the absence of a statutory or regulatory definition of the component elements of a commission as it is used in the context of an equitable adjustment, the term "commission" is most reasonably interpreted as a fee paid to a prime contractor (or in certain circumstances, a first tier sub-contractor), unrelated to calculations of profit or overhead, for services provided in the contractor's capacity as an agent who engaged, coordinated and managed the appropriate subcontractor to perform the work required by the government directed changes to the contract.

This interpretation is consistent with the interpretation afforded the GSAR Equitable Adjustment clause by recent decisions rendered by the GSA Boards of Contract Appeals, as well as the common definition of the term "commission." For example, Black's Law Dictionary defines "commission" as:

> The recompense, compensation or reward of an agent, salesman, executor, trustee, receiver, factor, broker, or bailee, when the same is calculated as a percentage on the amount of his transactions or on the profit to the principal.... A fee paid to an agent or employee for transacting a piece of business or performing a service.... Compensation to an administrator or other fiduciary for the faithful discharge of his duties.

BLACK'S LAW DICTIONARY 272 (6th ed.1990); *see also* WEBSTER'S NEW WORLD DICTIONARY THIRD COLLEGE EDITION 280 (1988) ("8[.] a fee or percentage of the proceeds paid to a salesperson, broker, etc., either in addition to, or in lieu of, wages or salary ..."). Under the current version of the GSAR Equitable Adjustment clause the commission to be paid to a contractor, like NACC, who arranged for another entity to actually perform the work, is an amount to be paid "in lieu of" the profit and overhead costs, or in other words, the "wages," in the form of profit and overhead costs, a contractor would otherwise earn.

This court's interpretation of a "commission" is further demonstrated by the fact that earlier versions of the Equitable Adjustment clause operated more like the equitable adjustment provisions in the standard Changes clause found in the FAR and did not differentiate between which items might be included as components in determining the overhead, profit and commission percentages. FAR 31.102. *See e.g. Blake Constr. Co., Inc.*, GSBCA No. 1834, 66–2 BCA ¶ 5741, 1966 WL 746 (July 29, 1966) ("[t]hese percentages shall be considered to include, but not be limited to, insurance, other than mentioned herein, bond or bonds, field and office super-

---

11. If the GSAR were found not to implement the FAR, the FAR alone would govern the parties' dispute. GSAR § 501.103. However, the parties have not challenged the applicability of the GSAR to this contract, and based upon the sub-

missions, it does not appear that GSAR § 552.243–71 fails to implement FAR § 52.243–4. In the absence of evidence to the contrary, the traditional maxims of statutory interpretation apply.

visors and assistants, use of small tools, incidental job burdens, and general office expense"); *see also Pyramid Construction Co.,* GSBCA No. 4882, 78–1 BCA ¶ 13,215, 1978 WL 2034 (May 1, 1978) ("[t]he maximum allowable overhead, profit and commission percentage[s] given in this paragraph shall be considered to include, but are not limited to, job-site staff and office expense, incidental job burdens, small tools and general office overhead allocation"). Rather, the earlier versions of the equitable adjustment clause placed a non-negotiable cap upon the amounts which might be recovered pursuant to each component of the equitable adjustment.

Under the current Equitable Adjustment regulation, however, the different treatment afforded to profit, overhead and commission percentages is clear, as is the provision that allows a contractor to demonstrate entitlement to a higher percentage than the suggested 10% rate found in the regulation. In the context of GSAR § 552.243–71, the equitable adjustment clause no longer contemplates allowing the CO and the contractor to avoid a careful examination of the individual components, of profit, overhead and commission, in order to arrive at prices for each of those items. Rather, the current version of the GSAR Equitable Adjustment clause expressly separates each of the three allowable components and specifically directs that with regard to profit and commission, "the percentages ... shall be negotiated and may vary according to the nature, extent and complexity of the work involved." GSAR § 552.243–71. "[A]llowable overhead" is treated differently than profit and commission, and the CO is directed that that amount "shall be determined in accordance with the contract cost principles and procedures in part 31 of the [FAR]." GSAR § 552.243–71; *see also* Ralph C. Nash and John Cibinic, *Cost Principles and Fixed Price Contract Adjustments: Strange Bedfellows,* NASH & CIBINIC REPORT, Nov. 1990, at ¶ 66 (discussing application of GSAR 552.243–71 in context of Price Adjustment clauses). This approach forces the CO and the contractor to focus less strenuously upon the price to be paid and to concentrate more heavily upon the classification of the items which are to be paid under the clause. Recent decisions interpreting the same language as was included in NACC's contract clearly demonstrate the care taken by the GSA Board of Contract Appeals to separate and distinguish between the three components of the equitable adjustment when construing the GSAR Equitable Adjustment clause. *See e.g. Eurostyle Inc. v. GSA,* GSBCA No. 12084, 94–2 BCA ¶ 26,891, 1994 WL 118708 (Apr. 4, 1994) ("[i]t is clear from the clause [GSAR § 552.243–71] that the *contractor is not to receive both a 10% commission and its overhead*") (emphasis added); *P.J. Dick Inc. v. GSA,* GSBCA No. 11,772, GSBCA No. 11,773, GSBCA No. 11,884–11,887, GSBCA No. 11,889, 94–3 BCA ¶ 27,266, 1994 WL 556905 (Oct. 7, 1994) (noting in footnote 10 that "pursuant to ... GSAR 552.243–71 (1984), the contractor is entitled to a ... commission *(not profit)* for work performed by other than his own forces") (emphasis added); *Koll Constr. Co. v. GSA,* GSBCA No. 12,306, 94–1 BCA ¶ 26,501, 1993 WL 409987 (Oct. 12, 1993) (applying GSAR § 552.243–71 without combining commission, overhead and profit).

*ii.*

◼ Moreover, it is a well established principle of contract interpretation that "provisions of a contract must be so construed as to effectuate its spirit and purpose ... an interpretation which gives a reasonable meaning to all of its parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous or achieves a weird and whimsical result." *Gould, Inc.,* 935 F.2d at 1274.

In support of the "reasonableness" of its assertion that the language of GSAR § 552.243–71 should be interpreted as allowing commission to be comprised of profit and overhead, NACC refers to a memorandum authored by Mr. Kevin Kearney, Chief of the Support Section within the Design and Construction Contracts Branch, dated September 8, 1992, and addressed to the GSA Region 9 Section Chiefs. Pl.'s App. at 46, 56–57. Although not expressly stated in the memorandum, NACC concludes that the premise of Mr. Kearney's statements on the subject of the GSAR Equitable Adjustment clause

mean that commission is to be calculated as the sum of overhead and profit calculations.

Notwithstanding NACC's characterizations, Mr. Kearney's thoughts on the subject were not related to this contract. *See* Deposition of Kevin Kearney, conducted on Sept. 25, 2001, at p. 22 ("Kearney Depo."), attached at Pl.'s App. at 50. As he explained at his deposition, Mr. Kearney's thoughts and opinions were meant as an impetus for beginning a general discussion, not as a directive for the calculation of contractor commissions in the context of equitable adjustments. *Id.* Moreover, there is no indication that Mr. Kearney's purported theory was utilized, or even considered by the GSA Region 9 Section chiefs to whom it was addressed. Rather, the memorandum was merely one government employee's assertion of a proposed approach to calculating the elements of the equitable adjustment pursuant to GSAR § 552.243–71.

■ Furthermore, although Mr. Kearney's position made him responsible for contracts for border stations, the NACC contracts were outside his scope of authority. *See* Kearney Depo. at p. 22, attached at Pl.'s App. 50. A contractor is entitled to rely on the representations and instructions given him by a representative of the contracting officer sent by the contracting officer for the express purpose of giving guidance in connection with the contract. *See Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 625, 427 F.2d 1233, 1243 (1970). Mr. Kearney was not, and could not be considered responsible for the NACC contracts. *See e.g. Sam Gray Enters., Inc. v. United States,* 43 Fed.Cl. 596, 603 (1999) (discussing limited authority granted to enter contracts on behalf of the government), *aff'd,* 250 F.3d 755 (Fed.Cir. 2000) (table). Accordingly, there is no basis for finding that Mr. Kearney could in any way bind the government with regard to the contract negotiations with NACC. *Max Drill,* 192 Ct.Cl. at 625, 427 F.2d at 1243 ("[a]n officer of the Government cannot bind the Government with respect to matters beyond the limit of his authority") (*citing Wilber Nat'l Bank v. United States,* 294 U.S. 120, 123–24, 55 S.Ct. 362, 79 L.Ed. 798 (1935)). "[T]he [g]overnment will not be bound by unauthorized interpretations of its ordinary employees.... a subordinate [g]overnment employee cannot render contract interpretation binding on the parties." *Max Drill,* 192 Ct.Cl. at 625, 427 F.2d at 1243.

Finally, NACC's assertion that the approach it has described in this matter was accepted by another GSA office is similarly unpersuasive. The agreement that was entered into with regard to the Spokane Project is not adequately explained in the Rutter letter in sufficient detail for this court to determine whether the CO responsible for negotiating that equitable adjustment accepted NACC's argument that commission is determined by adding together profit and overhead. In any case, the Rutter letter expressly states that any agreements entered into as a result of negotiations with regard to the Spokane Project were limited in both scope and effect to the Spokane Project. In the face of such qualifying language, and in the absence of any evidence that it was either the practice or custom of the government to so extend the effect of those negotiations, or that plaintiff's proposed resolution was allowed within the context of the regulations, there is no basis for applying the Spokane Project negotiations to the Sacramento Project. Plaintiff has merely demonstrated that in the negotiations with regard to the Spokane Project, it successfully persuaded the CO that it was entitled, presumably as a result of the nature, extent and complexity of the work, to a "mark up" above the 10% rate permitted pursuant to the GSAR Equitable Adjustment clause. The fact that NACC was once successful, in conjunction with a separate contract, in negotiating a higher percentage commission has no bearing upon the contractor's burden of proof in this matter to demonstrate the nature, extent and complexity of the Sacramento Project also warranted the application of a higher commission rate.

■ NACC's assertions of reasonableness are thus unfounded. Accordingly, it is concluded, based upon the unambiguous language of the regulation and the decisions of the GSA Board of Contract Appeals which have interpreted the wording of GSAR § 552.243–71, that the "fee" which is a con-

tractor's commission pursuant to the GSAR Equitable Adjustment clause cannot be calculated by adding together the contractor's profit and overhead costs. To the extent defendant seeks summary judgment upon this issue, that motion is granted.

### iii.

In the alternative, NACC argues that it has presented evidence that the work performed pursuant to the Changes clause in the Sacramento Project was of the nature, extent and complexity that would allow a commission, pursuant to the GSAR Equitable Adjustment clause, above 10%. Specifically, NACC challenges the CO's determination that the contractor has "failed to demonstrate any entitlement." Pl.'s App. at 6. In support of its assertions NACC relies upon the declarations of Mr. Henry Warden, in letters addressed to a member of a contract consulting firm, as well as an affidavit executed by Mr. Warden and attached to NACC's opposition to the government's motion for summary judgment. Additionally, NACC relies upon a statement by Ms. L. Darleen Starkey, which was attached to the contractor's August 14, 1996 request for the CO's final decision.

█ With regard to the contention by Ms. Starkey that the change order work was as complex as the original contract work, NACC has not presented persuasive evidence that the CO's conclusion, that this statement was insufficient to warrant an increased commission, was incorrect. The authority to determine the appropriate amount of equitable adjustments pursuant to GSAR § 552.243–71 has been delegated to the CO by Congress. See GSAR § 501.101(b)(2002). In the absence of an abuse of discretion, courts generally defer to the CO in determining equitable adjustments based upon the CO's availability at the construction site to evaluate conditions in conjunction with her expertise in the work required to perform projects, such as the Sacramento Project. See e.g. Pacific Architects & Eng'rs, Inc. v. United States, 203 Ct.Cl. 499, 517, 491 F.2d 734, 744 (1974) (determining that provision of contract which allows opportunity for negotiation and agreement with CO indicates intent of parties to abide by CO's discretionary determination of equitable adjustments); see also New York Shipbuilding Corp. v. United States, 180 Ct. Cl. 446, 460, 385 F.2d 427, 435 (1967) ("the existence of boards of contract appeals [or the Court of Federal Claims] should not be used to weaken the ... [CO]'s obligation" to utilize her discretion to resolve problems). Based upon the submissions, there is no viable basis to progress to evidentiary proceedings concerning additional compensation as an equitable adjustment.

█ With respect to Mr. Warden's letter and affidavit, NACC appears to be trying to introduce evidence regarding the type of work performed. See Pl.'s App. at 16 ("It should be noted that this is a very old rehabilitation project of an occupied facility that contains asbestos-contaminated materials, lead paint, and many other unknown factors. Arguments could be rendered that a greater than 10% rate would be appropriate for the attendant risk and exposure"). The operative facts of this claim are sufficiently different from Ms. Starkey's assertions (e.g., that the work required by the original contract and that required by the change orders was equally complex), that it must be considered a new claim. In order for this court to have jurisdiction to consider plaintiff's claim that the statements by Mr. Warden demonstrate facts which would allow a commission above 10%, NACC must have submitted that claim to the CO for a final decision. 41 U.S.C. § 605(a); Santa Fe Eng'rs, Inc. v. United States, 818 F.2d 856, 858 (Fed.Cir.1987); Atlanta Appraisal Servs., Inc. v. United States, 54 Fed.Cl. 51, 54 (2002); J. Cooper & Associates, Inc., v. United States, 47 Fed.Cl. 280, 284–85 (2000); Croman Corp. v. United States, 44 Fed.Cl. 796, 800 (1999). In conjunction with its request for a final decision, NACC stated that it believed it had been "denied its contractual right to demonstrate entitlement to a higher percentage than the '10% commission.'" Pl.'s App. at 1. The evidence presented to the court does not demonstrate that NACC ever presented the CO with a written description of factors enunciated by Mr. Warden which would demonstrate entitlement to higher commission. If these issues were raised at all, these

claims may have been mentioned during the settlement negotiations with the contracting officer in an oral discussion.[12] *See* Pl.'s App. at 1. Regardless, such claims cannot be heard in this court unless they were raised in either plaintiff's written claim to the contracting officer or its attachments thereto. 41 U.S.C. § 605(a); *Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 91 (1989). Because NACC does not appear to have presented Mr. Warden's statements to the CO, in writing, this court is precluded from considering the issue of whether those declarations would support a claim that the change order work was of the nature, extent and complexity that would allow a commission above 10% pursuant to the GSAR Equitable Adjustment clause.

Based upon the submissions which the court has jurisdiction to review, to the extent that defendant has moved for summary judgment upon the issue of whether NACC has adequately demonstrated that the nature, extent and complexity of the change order work warranted a higher commission rate, plaintiff has not demonstrated a sufficient basis for proceeding with evidentiary proceedings concerning additional compensation as an equitable adjustment. Accordingly, the government's motion for summary judgment on this issue is granted.

### CONCLUSION

Accordingly it is **ORDERED** that:

(1) In the absence of genuine issues of material fact and in light of the plain language of GSAR § 552.243–71, and based upon the persuasive authority rendered by the Board of Contract Appeals in interpreting that clause, it is concluded that the government's motion for summary judgment, upon the issue of whether a contractor's commission is calculated by combining that contractor's profit and overhead, is **GRANTED**;

(2) Additionally, NACC has failed to present evidence that a sufficient claim was submitted to the CO which would allow consider-

ation in this court whether the contractor has otherwise established that the change order work was of the nature, extent and complexity which would warrant a commission in excess of 10%, and in the absence .of genuine issues of material fact upon that issue, the government's motion for summary judgment is **GRANTED**;

(3) Final judgment shall be entered **DISMISSING** this action;

(4) Each party shall bear its own costs.

---

**12.** In NACC's request for the CO's final decision, dated August 14, 1996, authored by Ms. Kathleen Hartley, NACC's Director of Contracts and Dispute Resolution, NACC noted that "[Ms. Hartley] met with ... [the CO] and ... [her] staff in person at the beginning of ... [1996] to discuss settlement of the outstanding commission issue and was *verbally* denied entitlement at that time." Pl.'s App. at 1 (emphasis added).